EL PUEBLO DE PUERTO RICO, peticionario, *v.* GILBERTO MAISONAVE RODRÍGUEZ, acusado y recurrido.

*Número:* CE-87-262          *Resuelto:* 28 de junio de 1991

50

*Francisco J. Rodríguez Juarbe*, abogado del recurrido; *Rafael Ortiz Carrión, Procurador General*, y *Marjorie Rivera Rodríguez, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Pautamos sobre el valor probatorio de los exámenes de histocompatibilidad para determinar la paternidad cuando el presunto padre no queda excluido por dichas pruebas. Resolvemos que el por ciento de paternidad relativa que puede obtenerse con dichas pruebas científicas es un elemento evidenciario *más* que debe ser considerado por los tribunales, junto con los *demás* elementos probatorios (testimonios de las partes, prueba documental, relaciones entre las partes, posibilidad de acceso carnal, parecidos físicos, etc.), para llegar a su propia conclusión en cuanto a si se ha establecido o no la paternidad del presunto padre. Claro está, siempre que se establezca que dichas pruebas fueron realizadas por peritos debidamente calificados siguiendo las más estrictas normas en la realización de este tipo de análisis, y que se hayan observado las normas relativas a la cadena de evidencia en su presentación ante los tribunales. Veamos los hechos ante nos.

I

El 3 de marzo de 1985 la Sra. Lucy Barreto Bosques presentó una denuncia contra el Sargento de la Policía Gilberto Maisonave Rodríguez (sargento Maisonave), imputándole ser el padre de su hijo menor, Jayson Barreto, sin que aquél lo hubiera reconocido y cumplido con su obligación de proveerle alimentos. Art. 158 del Código Penal, 33 L.P.R.A. sec. 4241. Determinada la causa probable para el

arresto o la citación, el caso fue remitido al Tribunal de Distrito para la celebración del juicio correspondiente.

Así las cosas, el 8 de mayo de 1985 el Ministerio Público solicitó que se ordenara al acusado someterse a un examen serológico de histocompatibilidad (H.L.A.). La defensa del sargento Maisonave se opuso y alegó que ordenar dicho examen constituía una violación a los derechos civiles y constitucionales de su defendido, y que el examen de histocompatibilidad no había sido perfeccionado, por lo que sus resultados serían dudosos "ya que, solamente son excluyentes en favor del acusado en uno de los casos y en el resto de los casos no puede determinarse con *certeza absolutamente* nada con relación a la paternidad d[e u]n niño". (Énfasis suplido.) Anexo II.

█   Luego que le fueran sometidos los memorandos como apoyo de las respectivas posiciones, el Tribunal de Distrito ordenó a las partes someterse a las pruebas de sangre.[1]

El 26 de agosto de 1985 las partes se sometieron a las pruebas de histocompatibilidad (H.L.A.) en el Laboratorio de Histocompatibilidad del Departamento de Patología del Recinto de Ciencias Médicas de la Universidad de Puerto Rico (en adelante Laboratorio).

El 6 de septiembre de 1985 el Laboratorio rindió su informe con los resultados del examen. En dicho informe se señaló que "el Sr. Gilberto Maisona[v]e Rodríguez *no se puede excluir de ser el padre* de Jayson Barreto ya que [é]l puede aportar el haplotipo A30,B39 presente en el niño. *La*

---

[1] Cabe señalar que mediante la Ley Núm. 10 de 16 de julio de 1990 se enmendó el inciso (C) de la Regla 82 de Evidencia, 32 L.P.R.A. Ap. IV, con el propósito de hacer obligatorio para el tribunal el que requiera a todas las partes en las controversias sobre paternidad que se sometan a los exámenes de sangre si mediara una oportuna moción de parte a tales fines. Ello, con el fin de agilizar el establecimiento de la paternidad en dichos casos. Véase la Exposición de Motivos de la Ley Núm. 10, *supra*, Leyes de Puerto Rico, pág. 67.

*probabilidad relativa de que el Sr. Gilberto Maisonabe* [sic] *sea el padre es de 98.5%".* (Énfasis suplido.) *Exhibit III.*

Después de varios trámites procesales, se celebró la vista del caso el 16 de enero de 1986. La prueba de cargo consistió en el testimonio de la Sra. Lucy Barreto, su hermana Carmen, su sobrina de catorce (14) años de edad, Elena Quiñones, y el perito médico, Dr. Eliud E. López, entonces Director del Departamento de Patología del Recinto de Ciencias Médicas de la Universidad de Puerto Rico (R.C.M.-U.P.R.). Además, el Ministerio Público presentó como evidencia el informe de las pruebas de histocompatibilidad practicadas a las partes.

La Sra. Lucy Barreto declaró, en síntesis, que conoció al sargento Maisonave desde finales de 1981. Alegadamente, Maisonave le dijo que estaba separado de su esposa, pero ella no corroboró esta información. Luego de un buen tiempo de hablarle y conocerlo, comenzó a tener relaciones sexuales con él a mediados de mayo de 1982. Según ella, tenía relaciones sexuales con Maisonave tres (3) veces al mes, los miércoles —cuando se realizaban los círculos de oración en la iglesia— por la noche y en horas de trabajo del sargento Maisonave. Ella especificó que tuvo estas relaciones en el Hotel Paraíso, la primera vez; la segunda, en un callejón del barrio Cuchillas de Moca; la tercera, en el Hotel Western y, la cuarta, en *una casa en construcción* del Sr. Héctor Colón. Durante estas relaciones sexuales no usó contraceptivos. Salían en un automóvil de marca Maverick, propiedad de Maisonave.

La señora Barreto sostuvo que antes de tener relaciones sexuales con el sargento Maisonave no las tuvo con ninguna otra persona. Señaló, además, que su última menstruación fue, según su recuerdo, *el 5 de mayo de 1982.* El menor, Jayson Barreto, nació el 20 de febrero de 1983. Dijo que no supo que estaba embarazada hasta el 16 de noviembre de 1982 cuando su hermana, Carmen Barreto, vino de Nueva York, la notó gorda y le dijo que estaba embarazada.

Su hermana Carmen se entrevistó con el sargento Maiso-
nave y éste, alegadamente, le dijo "que ese niño no era de
él y que esperara más tiempo". *Exhibit* VII, pág. 4. Alega-
damente, Maisonave le dijo que esperara tres (3) años para
él reconocerlo.

Admitió que salió con el sargento Maisonave los días 12,
19 y 26 de mayo de 1982 y que se acordaba de todas estas
fechas porque su otra hermana (Susana) "tenía un diario
donde apuntaba todo esto". *Exhibit* VII, pág. 4. Declaró que
continuó saliendo con el sargento Maisonave hasta el 19 de
junio de 1982, cuando se enamoró de Alberto González,
también conocido por "Pilón". En el contrainterrogatorio
señaló que se hizo novia de Alberto el 19 de junio de 1982 y
se dejó de éste el 16 de noviem-bre del mismo año, una vez
le informó que estaba embarazada del sargento
Maisonave. Alberto la visitaba, pero desconocía su estado
de embarazo. Nunca le ha reclamado el reconocimiento del
niño a Alberto, pues nunca tuvo relaciones sexuales con él.
Señaló que hubiera deseado que el niño fuera hijo de Al-
berto ("Pilón").

En el redirecto, la señora Barreto señaló que, aun
siendo una persona delgada, a los cinco (5) meses no se le
notaba barriga. Sólo creía que estaba gorda. Era la pri-
mera vez que quedaba embarazada.

La joven Elena Quiñones, de catorce (14) años de edad y
sobrina de la Sra. Lucy Barreto, declaró que el sargento
Maisonave le enviaba con ella mensajes "a Lucy [para] que
bajara al pueblo". *Exhibit* VII, pág. 6. Veía a Maisonave
trabajando con uniforme por el día cuando éste le enviaba
los mensajes a Lucy.

La Sra. Carmen Barreto, hermana de Lucy, atestó que
cuando vino de Nueva York el 10 de noviembre de 1982 vio
a su hermana demasiado gorda y rara, por lo que le pre-
guntó qué le sucedía. Lucy le contó que ella salía con
Maisonave. Cuando por fin la testigo le "sacó la verdad",
Lucy le dijo lo que estaba ocurriendo. Lucy, llorando, le dijo

que "la regla no le venía hacía más de cuatro (4) meses y ... que [el niño] era de Maisonave". *Exhibit* VII, pág. 7. Señaló la Sra. Carmen Barreto que fue al Cuartel de la Policía de Moca y allí encontró al primo de Maisonave, a quien le contó lo que sucedía y le pidió que le dijera a Maisonave que quería hablar con él. Sostuvo que Maisonave "apareció donde vivía Lucy" para hablar con la testigo. Ésta le preguntó "qu[é é]l iba a hacer con el hijo que Lucy iba a tener" y él le dijo *"que a él no le convenía por su profesión*([2]) lo que sucedía y que lo podían [b]otar del trabajo". (Énfasis suplido.) Íd., pág. 6. Declaró que Maisonave le dijo que Lucy "se lo sacara" (abortara). Para ello le ofreció dinero.

En el contrainterrogatorio señaló que conoció a Alberto González, conocido por "Pilón", cuando vino a Puerto Rico. Era novio de Lucy y lo conoció en la casa de su mamá. Admitió que no sabía si anteriormente pasó algo entre Lucy y Alberto. Lucy le dijo "que su problema era muy grande porque si ella tenía su novio y después tenía un hijo de otro y, le tenía que decir la verdad a Alberto. Que Alberto no la perdonó". *Exhibit* VII, pág. 7. Finalmente, señaló que se fue para Nueva York el 16 de noviembre de 1982. Para esa fecha, según ella, "Alberto no veía a Lucy". Íd.

Como último testigo de cargo declaró el Dr. Eliud López Vélez, entonces Director del Departamento de Patología del Recinto de Ciencias Médicas de la Universidad de Puerto Rico. Atestó el doctor López que el 26 de agosto de 1985 se examinaron en dicho departamento el sargento Maisonave, la señora Barreto y el menor mediante la prueba H.L.A. (*Human Leukocyte Antigen*).

---

([2]) El policía Maisonave era un hombre casado. La disposición del Reglamento de la Policía de Puerto Rico aplicable a dicho agente considera como falta grave el procrear hijos fuera del matrimonio. Art. XIV, Sec. 14.5(26) del Reglamento de la Policía de Puerto Rico. La admisión de paternidad o reconocimiento de ese hijo extramatrimonial podía sujetarlo a medidas disciplinarias que van desde la expulsión del Cuerpo, degradación o suspensión de empleo y de sueldo.

Según el doctor López, mediante la prueba H.L.A. "se trata de establecer la paternidad o no paternidad de un supuesto padre biológico" —*Exhibit* VII, pág. 2— pues "se ha encontrado que hay ciertas características en los seres humanos que se transmiten de padres a hijos a través de los genes; se espera, pues, que una persona contenga un componente que proviene del padre y otro que proviene de la madre". Íd., págs. 1–2. Explicó que en el procedimiento de análisis de las muestras

> ... los Tecnólogos toman la muestra, anotan las distintas reactividades de las pruebas, y analizan los resultados que luego someten en un informe. Que el informe consiste de cuatro reacciones genéricas, dos reacciones tipo A y dos reacciones tipo B; que una de las reacciones proviene de la madre y la otra del padre; que se comparan [e]stos marcadores biológicos y si el presunto padre los tiene se procede a determinar la frecuencia de [tales] marcadores biológicos y se hace un cálculo porcentual de la *probabilidad relativa* de que el supuesto padre en efecto lo sea; comparando cu[á]l es la probabilidad de que un hombre tomado al azar pueda aportar esos mismos marcadores aportados por el presunto padre. Que esta relación estadística se le llama Probabiladad relativa de Paternidad [ (P.R.P. )].

El doctor López señaló que el P.R.P. del señor Maisonave era de 98.5% y que, de acuerdo con las guías establecidas por el Comité Conjunto de la Asociación Médica Americana y la Asociación Americana de Abogados (*Joint AMA–ABA Committee*), esa prueba genérica caería bajo el concepto de "muy probable" (*very likely*) de paternidad, y que tal resultado indicaría y/o sería favorable a la posibilidad de que el presunto padre sea el padre biológico, siempre que la otra prueba (testimonios, observación del parecido del menor con el padre, etc.) sea compatible con el resultado.

Sostuvo, además, que esta prueba es confiable en cuanto a excluir paternidad y tiene en la población puertorriqueña una probabilidad de 85% de exclusión de paternidad; esto es, que el 85% de la población puertorriqueña al someterse a la prueba podría estar sujeta a ser excluida con respecto

a la paternidad de forma efectiva. Adujo que esto es así porque la prueba tiene muchos marcadores genéricos.

En cuanto al procedimiento de tomar la muestra, el doctor López admitió que una prueba como ésta debe mostrar que todos los factores son controlables para que sea satisfactoria, y que las personas que administran la misma estén capacitadas y certificadas para ello. De surgir algún problema con la muestra obtenida, siempre se procede a tomar muestras adicionales notificándose a las partes. A éstas se les solicita una fotografía para tener evidencia de que son quienes dicen ser.

Culminó su examen directo al señalar que la prueba H.L.A. no es conclusiva y no puede decir que una persona es el padre biológico, sino que la prueba determina que existe una probabilidad relativa X de que lo sea o no si la persona no ha sido excluida como padre.

En el contrainterrogatorio admitió que él, personalmente, no efectuó las pruebas de sangre en este caso, pero que por las identificaciones de los documentos de la prueba realizada podía saber quién efectuó la misma y quiénes la supervisaron. Él entiende que en Puerto Rico, en Estados Unidos y en Europa la prueba de H.L.A. no sólo se usa para excluir, sino también para establecer un por ciento de probabilidad relativa de paternidad. La prueba no es absoluta; tiene que tener unos controles y se tiene que hacer con reactivos confiables y por personas profesionalmente adiestradas bajo la supervisión debida. Explicó que cualquier hallazgo particularmente importante (ej. características de antígenos raros que no pueden identificarse, etc.) se anota en el informe que rinde el departamento. Terminó su contrainterrogatorio reafirmando que la probabilidad relativa de paternidad de 98.5% en este caso no era arriesgada *porque aquí se siguieron los procedimientos al realizar la prueba.*

Presentada la prueba de cargo, el juez de distrito que presidió la vista (Hon. Francisco Gandarilla) tuvo la opor-

tunidad de observar al niño, que entonces tenía dos (2) años y once (11) meses de edad, frente al sargento Maisonave y a la señora Barreto para comparar su parecido.

La prueba de la defensa consistió en los testimonios del ex policía Alberto Alicea, del policía Manuel Pérez y del acusado recurrido.

El señor Alicea declaró que era pensionado de la Policía, donde ocupó el cargo de capitán. Para la fecha de los hechos prestaba servicios en el distrito policíaco de Moca donde conoció al sargento Maisonave y a Lucy Barreto. Señaló que a principios de 1983 la señora Barreto fue al Cuartel de la Policía de Moca "a pedir una orientación, porque ella había tenido un hijo de un individuo que le decían Pilón ...". *Exhibit* VII, pág. 7. Alega el testigo que le dijo a la señora Barreto que "llevara ese caso a la Corte, que presentara una querella para que se llevara al tribunal ...". Íd., págs. 7–8. Sostuvo que cuando la señora Barreto fue a hablar con él nunca mencionó el nombre del sargento Maisonave.

En el contrainterrogatorio, señaló que el sargento Maisonave trabajaba bajo su supervisión y que éste siempre desempeñaba sus funciones cuando tenía que trabajar. Aclaró que no podía dar fe de que Maisonave estaba en sus funciones todo el tiempo.

El policía Manuel Pérez testificó que trabajaba en el Cuartel de la Policía de Moca para el momento de los hechos y que conocía a la señora Barreto. Atestó que a finales de 1981 y principios de 1982 vio a la señora Barreto en las "ruinas" de la playa de la Base Ramey acompañada de un señor grueso[3] que él no conocía. Luego la vio con ese señor dos (2) o tres (3) veces. Nunca vio a la señora Barreto con el sargento Maisonave.

En el contrainterrogatorio expresó que trabajó bajo la

---

[3] Alberto González, conocido por "Pilón", fue descrito por el sargento Maisonave como un hombre blanco y grueso.

supervisión del sargento Maisonave y que lo considera su amigo. *Tanto así que, si con su testimonio fuera a perjudicar a su amigo, él no declararía.*

Señaló que no sabía si la persona que él observó en compañía de la señora Barreto era hermano o pariente de ésta, ya que nunca dialogó con esa persona.

Finalmente, declaró el propio sargento Maisonave. Señaló que trabajó en el Cuartel de la Policía de Moca entre seis (6) a siete (7) años. Durante los primeros dos (2) años conoció a Lucy Barreto cuando ésta fue al cuartel a presentar varias querellas. Afirmó que nunca salió con la señora Barreto, que nunca ha visitado moteles y que es *casado*. Expresó haber conocido a la Sra. Carmen Barreto cuando ésta vino a buscarlo al cuartel y le preguntó si había salido con su hermana Lucy. Él le dijo que nunca lo había hecho. Adujo que la Sra. Carmen Barreto le dijo que Lucy había tenido un hijo y su novio (Alberto) le había dicho que no era de él. Que venía a hablar con el testigo para que lo reconociera como su hijo. La Sra. Carmen Barreto se marchó y regresó como a los tres (3) días. Le dijo "que Lucy había tenido un mucha[ch]o y que alguien se lo tenía que reconocer: 'te lo vamos a a achacar a ti a menos que t[ú] nos consigas diez mil pesos'", porque ella necesita una casa para vivir y la casa costaba como mil pesos. *Exhibit* VII, págs. 9–10. No vio más a la Sra. Carmen Barreto hasta el día del juicio. Se reafirmó en que nunca ha tenido relaciones sexuales con Lucy y que muchas veces la vio con Alberto cerca del cuartel en un auto "Camaro" blanco. Adujo, además, que nunca puede abandonar su servicio porque su responsabilidad es asignar trabajo y velar por que sus órdenes se cumplan. Finalmente, sostuvo que nunca le dio dinero a la Sra. Carmen Barreto a pesar de que, posteriormente, ésta le pidió menos, como seis mil (6,000) dólares.

Según el sargento Maisonave, Lucy Barreto nunca se ha dirigido a él para discutir nada sobre el niño.

En el contrainterrogatorio señaló que conocía a la Sra.

Lucy Barreto "porque ella iba al Cuartel a llamar por teléfono y tomaba agua allí"; que identificaba el vehículo de "Pilón" y "estaba bien pendiente a lo que Lucy hacía, porque su trabajo es el estar pendiente a todo lo que pasa, mayormente de noche". *Exhibit* VII, pág. 10.

Esa fue la prueba testifical que tuvo ante sí el Tribunal de Distrito. Dicho foro encontró al acusado culpable del delito imputado y dispuso la suspensión de lectura de sentencia sujeta a que éste reconociera al menor y le pasara $15.00 semanales por concepto de pensión alimentaria.

Inconforme con el fallo, el acusado presentó un escrito de apelación ante el Tribunal Superior. Señaló como errores del Tribunal de Distrito el que: (1) no se estableciera su culpabilidad más allá de duda razonable; (2) errara en la apreciación de la prueba, y (3) permitiera el uso de la prueba de sangre en violación a su derecho a la no autoincriminación.

El Tribunal Superior dictó sentencia y revocó la dictada por el Tribunal de Distrito. Fundamentó su dictamen en la falta de crédito del testimonio de la madre del menor y en la insuficiencia del resultado de las pruebas de sangre para satisfacer el grado de prueba requerido para encontrar al acusado culpable, más allá de duda razonable, por violación al Art. 158 del Código Penal, *supra*.

Acude ante nos el Procurador General para que revisemos ese dictamen. Aduce El Pueblo que:

A. Erró el Tribunal Superior al intervenir con la apreciación de la prueba hecha por el Tribunal de Distrito que tuvo la oportunidad de ver y o[í]r a los testigos declarar.
B. Erró el Tribunal Superior al resolver que la prueba presentada en este caso no es suficiente para establecer la culpabilidad del acusado más allá de duda razonable. Petición de *certiorari*, págs. 5–6.

Mediante trámite de mostrar causa, ordenamos al recurrido que justificara el porqué no debíamos dejar sin efecto

la sentencia dictada por el Tribunal Superior. El recurrido compareció. Resolvemos según lo intimado.

## II

*Alcance de la función revisora del Tribunal Superior*

■ El procedimiento para apelar las sentencias criminales dictadas por el Tribunal de Distrito ante el Tribunal Superior está reglamentado por la Sec. 19 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 L.P.R.A. sec. 122; la Regla 216 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, y las Reglas de Apelación del Tribunal de Distrito al Tribunal Superior de 1 de octubre de 1979 (4 L.P.R.A. Ap. III–A).[4] Allí se establecen los requisitos procesales para tramitar la apelación. Véanse, además: Calderón y Rivé, *Manual de Procedimientos Apelativos*, 87 Rev. Jur. U.I.A. 235–244 (1987); I.N. Rivera, *Las Reglas de Apelación del Tribunal de Distrito al Tribunal Superior: un señalamiento de errores*, 6 (Núm. 2). Boletín Judicial 2 (1984).

■ Ahora bien, al considerar en apelación una sentencia dictada por el Tribunal de Distrito, el Tribunal Superior está sujeto a las mismas limitaciones que tradicionalmente se ha impuesto este Tribunal con respecto a la apreciación de la prueba oral hecha por el foro recurrido. *Morales v. Tribunal Superior*, 84 D.P.R. 123 (1961); *Mercado v. Hull Dobbs Corp.*, 90 D.P.R. 864, 867 (1964). Las determinaciones del tribunal de origen no deben ser descartadas arbitrariamente ni sustituidas por el criterio del tribunal apelativo a menos que éstas carezcan de fundamento suficiente en la prueba presentada. Es doctrina reiterada por las decisiones de este Tribunal que los foros

---

(4) Véase *González Santos v. Bourns P.R., Inc.*, 125 D.P.R. 48 (1989), sobre el procedimiento apelativo del Tribunal de Distrito al Superior en casos civiles.

recurridos están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de ver y oír a los testigos declarar y, por tal razón, su apreciación merece gran respeto y deferencia. *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Ríos Álvarez*, 112 D.P.R. 92 (1982). En ausencia de pasión, prejuicio, parcialidad y error manifiesto, y a menos que la apreciación de la evidencia se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el foro recurrido. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988); *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 826 (1983); *Pueblo v. Turner Goodman*, 110 D.P.R. 734, 738 (1980); *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 581–582 (1961).

■ Ello no significa que el foro recurrido está inmune al error. *Pueblo v. Pagán Díaz*, 111 D.P.R. 608, 621 (1982). Además, hemos revocado sentencias en las cuales las determinaciones de hecho, aunque sostenidas en la prueba aportada, no establecen la culpabilidad del acusado más allá de duda razonable. *Pueblo v. Meléndez Rolón*, 100 D.P.R. 734 (1972); *Pueblo v. Rivera Arroyo*, 100 D.P.R. 46 (1971); *Pueblo v. Díaz Just*, 97 D.P.R. 59 (1969); *Pueblo v. Toro Rosas*, 89 D.P.R. 169 (1963).

Sin embargo, examinados los autos de este caso, no encontramos las circunstancias que podrían justificar la revocación de la sentencia del Tribunal de Distrito por éste haber apreciado erróneamente la prueba ni que dicha prueba sea insuficiente en derecho para probar la culpabilidad del acusado más allá de duda razonable. Veamos.

## III

De la exposición narrativa de la prueba surge que las contenciones de las partes son totalmente irreconciliables

y contradictorias; esto es, la prueba testifical del acusado tiende a negar la prueba de cargo. De suerte que el Tribunal de Distrito tuvo que creer la prueba de cargo para hallar al acusado culpable, pues de haber creído la del acusado, necesariamente tenía que absolverlo. El Tribunal de Distrito, quien vio y oyó a los testigos, dirimió el conflicto de credibilidad a favor de la prueba de cargo. Estando en mejor posición que el foro apelativo, tal determinación, al dirimir prueba conflictiva, debe prevalecer. *Pueblo v. Morales Rivera*, 112 D.P.R. 463, 464 (1982). Examinados los testimonios de cargo, encontramos que los mismos tampoco resultan increíbles o imposibles.

La prueba de cargo tendió a demostrar que el sargento Maisonave tuvo contacto carnal con la señora Barreto, del cual nació el menor Jayson. Tendió a demostrar, además, que el sargento Maisonave se niega a reconocer dicho niño y a cumplir con su obligación legal de proveerle alimentos. La prueba de defensa no rebatió el hecho de que Maisonave pudo haber tenido contacto carnal con la señora Barreto durante sus horas de trabajo. El propio capitán Alicea, supervisor de Maisonave, no pudo dar fe de que éste no se ausentara de su trabajo durante las noches.

El hecho de que Maisonave fuera un hombre casado no niega que tuviera relaciones sexuales con la señora Barreto durante hora y media a la semana. Tampoco resulta increíble que la señora Barreto no tuviera relaciones con su novio, quien la visitaba en su casa y con quien presumiblemente se podía casar, y sí las tuviera con el sargento Maisonave. El carácter, la conducta y las motivaciones de la señora Barreto no podían ser cuestionadas por el foro apelativo. Para ello, la defensa de Maisonave tuvo la oportunidad de establecer cualquier impugnación que creyera pertinente durante el juicio.

En fin, erró el foro apelativo (Tribunal Superior) al variar arbitrariamente el criterio informado del foro recurrido (Tribunal de Distrito) por el suyo, pues están ausen-

tes las circunstancias extraordinarias que justificarían rechazar la evaluación de la prueba hecha por el foro recurrido.

## IV

■ En nuestro sistema de derecho es principio fundamental que todo ciudadano acusado de delito público tiene el derecho constitucional a que el Estado demuestre su culpabilidad más allá de duda razonable[5] en un juicio público, justo e imparcial. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Pueblo v. Robles González*, 125 D.P.R. 750 (1990); *Pueblo v. Cabán Torres*, supra. La duda razonable la hemos definido como aquella insatisfacción o intranquilidad en la conciencia del juzgador de los hechos sobre la culpabilidad del acusado luego de desfilada la totalidad de la prueba de cargo. *Pueblo v. Robles González*, supra; *Pueblo v. Toro Rosas*, supra; *Pueblo v. Cabán Torres*, supra.

■ La prueba de cargo debe establecer todos los elementos del delito y la conexión del acusado con los mismos con prueba suficiente y satisfactoria; es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Cabán Torres*, supra, pág. 652; *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748 (1985); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974); *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287 (1988); *Pueblo v. Narváez Narváez*, 122 D.P.R. 80 (1988). *Cf.* Regla 10(C) de Evidencia, 32 L.P.R.A. Ap. IV.

---

[5] Corresponde al Ministerio Público alcanzar tal grado de prueba y así demostrarlo al juzgador de los hechos con respecto a cada uno de los elementos constitutivos del delito y de la conexión del acusado con los mismos. Esa función es indelegable. *Pueblo v. Carrasquillo,* 102 D.P.R. 545 (1974); D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño*, 2da ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1981, pág. 163.

Veamos si en el caso de autos se cumple con estas exigencias.

■ El aquí recurrido fue acusado de infringir el Art. 158 del Código Penal, *supra*. Dicho precepto legal requiere, como uno de los elementos constitutivos de este delito, que debe ser probado por el Ministerio Público, más allá de duda razonable y con evidencia suficiente en derecho, que el acusado *sea el padre* del menor a favor de quien se reclaman los alimentos. *Cf. Román v. Fattah*, 109 D.P.R. 493 (1980); D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 275.

En los autos encontramos esa prueba. Aquí, el Ministerio Público trajo prueba testifical, pericial y no pericial, así como evidencia documental científica para establecer que el sargento Maisonave es el padre de Jayson. Veamos.

## V

En el caso de autos, la señora Barreto afirmó que a mediados de mayo de 1982 tuvo relaciones sexuales con el sargento Maisonave sin utilizar anticonceptivos y que su última menstruación, según su recuerdo, fue el 5 de mayo de ese año. El niño nació el 20 de febrero de 1983, esto es, a los nueve (9) meses de haber tenido esas relaciones. Declaró que se hizo novia de Alberto González el 19 de junio de 1982, pero que nunca tuvo relaciones sexuales con éste. Este testimonio fue creído por el foro recurrrido. La prueba de la defensa, que trató de vincular a Alberto teniendo relaciones sexuales con la señora Barreto en las "ruinas" de la playa de la Base Ramey, no fue creída por el foro de instancia porque el propio testigo que hizo la insinuación (policía Manuel Pérez) señaló que no declararía si su testimonio fuera a perjudicar a su supervisor y amigo Maisonave.

Lo que sí surge claramente de los testimonios vertidos en el Tribunal de Distrito es que el sargento Maisonave tuvo la *oportunidad de tener acceso carnal* con la señora Barreto.

Por otro lado, el juez de instancia tuvo la oportunidad de tener ante sí a la señora Barreto, a Jayson y al sargento Maisonave, y comparar el parecido físico. Jayson ya contaba con dos (2) años y once (11) meses de edad.

Finalmente, el foro recurrido tuvo ante sí el testimonio pericial del Dr. Eliud López Vélez quien interpretó los resultados de las pruebas de sangre H.L.A.

En *Ortiz v. Peña*, 108 D.P.R. 458, 462 (1979), al reconocer el "progreso continuo que se evidencia en el campo de las investigaciones de las ciencias médicas en general y las ramas altamente especializadas de la inmunología y la serología —dentro de la rama de la hematología— en particular", señalamos que los resultados obtenidos en las pruebas de sangre utilizadas más frecuentemente reflejan una precisión y confiabilidad en grados suficientes para justificar su admisibilidad ante los tribunales como *prueba concluyente de que un individuo a quien se le imputa la paternidad de una criatura no es el padre biológico.*

Reconocimos, sin embargo, que "la tendencia más reciente en el área de la investigación de las pruebas serológicas para la exclusión de la paternidad *se orienta a demostrar científicamente las probabilidades de que un individuo sea el padre de un niño*". (Énfasis suplido.) *Ortiz v. Peña*, supra, pág. 464.

Una de las pruebas de sangre que con mayor frecuencia se utiliza en estos casos, y donde la paternidad está en controversia, es el examen serológico de histocompatibilidad H.L.A. Ésta, como otras pruebas, es predominantemente de *exclusión de paternidad*, pero es posible mediante ella establecer un porcentaje de paternidad relativa. Dr. A. Rodríguez Trinidad, *La sangre habla: las*

*pruebas de exclusión de paternidad,* 1 (Núm. 3) Forum 14 (1985); P.I. Terasaki, *Resolution by H.L.A. Testing of 1,000 Paternity Cases not Excluded by ABO Testing,* 16 (Núm. 1) J. Fam. L. 543 (1977–1978); M.R. Henry, F. Victoria y B. schwartz, *Scientific Testing for Paternity Establishment,* 6 (Núm. 2) Forum 21, 29 (1990); Verruno y Hass, *Manual para la investigación de la filiación,* Buenos Aires, Ed. Abeledo-Perrot, 1985. En síntesis, esta prueba consiste en que

> ... mediante pruebas de laboratorio, se determinan las características o haplotipos de las tres partes. Una vez determinado el de la madre, se compara con el del menor. Uno de los genes de la madre, que identificamos con un locus, debe ser idéntico a uno de los del haplotipo del menor. El otro gene es el que se llama gene obligatorio y tiene que estar presente en el padre biológico. Si el presunto padre no tiene ese gene obligatorio, entonces no puede ser el padre. Si lo tiene, habrá que determinar la probabilidad relativa de que lo sea .... Rodríguez Trinidad, *supra,* pág. 15.

Claro está, la confiabilidad y admisibilidad de estas pruebas dependen *de que sean hechas por peritos debidamente calificados que sigan las más estrictas normas exigidas para esta clase de análisis y se observen las normas relativas a la cadena de evidencia en su presentación ante* los tribunales. *Ortiz v. Peña,* supra, pág. 469; Regla 82(C) de Evidencia, *supra.*

Una vez la prueba es realizada por peritos debidamente calificados, siguiendo los procedimientos y las normas exigidas para su realización y presentación ante el tribunal, a estas pruebas H.L.A. se le reconocía en 1976 un grado de confiabilidad de 76 a 81 por ciento *en la exclusión de paternidad.* Joint AMA–ABA Guidelines, *Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 (Núm. 3) Fam. L.Q. 247, 276 (1976). El doctor Rodríguez Trinidad considera que "[d]ados los últimos hallazgos en este campo, actualmente el grado de certeza podría ser mayor". Rodríguez Trinidad, *supra,* pág. 17.

Pero, *con esta prueba se ha encontrado que existe un 90% de probabilidad de que un presunto padre no excluido sea el padre biológico.* Terasaki, *supra*, pág. 543. *Claro está, esto es sólo una probabilidad relativa de paternidad.* El doctor Rodríguez Trinidad señala:

Determinar la paternidad relativa a base de ésta [prueba H.L.A.] es un procedimiento más complicado que, como implica el término "relativa", no puede llevar a conclusiones definitivas. El perito médico sólo puede hablar de probabilidad; no puede concluir. Toca al juez determinar la paternidad valiéndose de este elemento aportado por la ciencia *en conjunción con todos los demás elementos de prueba que se presenten ante el tribunal: relaciones entre las partes, parecidos físicos, posibilidades de acceso carnal,* etc., etc. (Énfasis suplido.) Rodríguez Trinidad, *supra*, pág. 16.

¿Cómo se determina la Probabilidad Relativa de Paternidad (P.R.P.)? Primero, "es obligatorio conocer la frecuencia con que las características o antígenos HLA de las tres partes [involucradas] se distribuyen en la población donde se plantea el problema ....([6]) Una vez conocidas las frecuencias, se realizan los cálculos de pro babilidad relativa de transmisión genética de la madre y del presunto padre al menor. Finalmente, se compara la probabilidad de paternidad del presunto padre con las de un individuo escogido al azar que presente el mismo haplotipo obligatorio del padre biológico". Rodríguez Trinidad, *supra*, pág. 6. De suerte que el resultado del P.R.P. "significa la probabilidad relativa porcentual de que un presunto padre sea el padre biológico en comparación con un indivi-

---

([6]) En Puerto Rico se utiliza la distribución de características H.L.A. preparado por E. Nettleship en su estudio *The Role of H.L.A. in Transplantation and the H.L.A. Composition of Puerto Rican Population,* publicado en el Boletín de la Asociación Médica de Puerto Rico en febrero de 1980. El doctor Rodríguez Trinidad advierte que si la muestra de sangre se envía a un laboratorio fuera de la isla, y en lugar de aplicar las frecuencias correspondientes a Puerto Rico aplican las de otros lugares, no sería recomendable utilizar los resultados de la Probabilidad Relativa de Paternidad (P.R.P.) para efectos de Puerto Rico. En el cálculo de P.R.P. se utilizan las leyes mendelianas de genética.

duo escogido al azar que presente el mismo haplotipo obligatorio del padre biológico". Íd. Por ejemplo, una probabilidad relativa de 98.5%, como la del caso de autos, indica que el presunto padre tiene un 98.5% de posibilidades de ser el padre del menor frente a otro individuo escogido al azar y que tenga el mismo haplotipo obligatorio que presenta el padre biológico, que sólo tiene un 1.5% de posibilidades. De acuerdo con Joint AMA–ABA Guidelines, *supra*, este resultado establece muy probablemente (*very likely*) la paternidad del presunto padre.[7]

*El juez puede utilizar esta probabilidad como un elemento más para llegar a su propia conclusión, luego de aquilatada toda la prueba, sobre si el presunto padre no excluido por la prueba H.L.A. es o no el padre biológico del menor.*

▇ En el caso de autos, el resultado del P.R.P., en conjunción con los testimonios creídos por el Tribunal de Distrito que establecen la oportunidad del presunto padre de tener acceso carnal con la señora Barreto, así como la observación de dicho foro sobre el parecido físico entre las partes, eran prueba suficiente y satisfactoria (capaz de producir, como en nosotros produce, certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido) de que el señor Maisonave es el padre biológico del menor a favor de quien se reclaman los alimentos a tenor con el Art. 158 del Código Penal, *supra*.[8] Ese ele-

---

[7] Estas guías establecen una gradación de probabilidades de paternidad conforme a los resultados del P.R.P. Según la misma, de 99.80% a 99.90% la paternidad está prácticamente probada (*practically proved*); de 99.1% a 99.75% es extremadamente probable (*extremely likely*); de 95% a 99% es muy probable (*very likely*); de 80% a 90% no se puede decidir (*undecided*), y menos de 80% no es útil para determinar paternidad (*not useful*). Joint AMA–ABA Guidelines, *Present Status of Serologic Testing in Problems of Disputed Parentage*, 10 (Núm. 3) Fam. L.Q. 247, 262 (1976).

[8] En el caso de autos, el recurrido no cuestionó ante el Tribunal de Distrito la forma y manera en que se llevaron a cabo las pruebas de sangre ni cómo se presentaron ante dicho foro (cadena de evidencia). En su escrito para mostrar causa, el recurrido sostiene que el laboratorio que realizó la prueba de sangre en este caso "no estaba preparado para certificar resultados concluyentes de paternidad. ... El perito que compareció al Tribunal, Dr. El[iud] López V[é]llez, no fue quien realizó las

mento constitutivo de delito fue establecido más allá de duda razonable por la prueba desfilada por el Ministerio Público ante el Tribunal de Distrito. Erró el Tribunal Superior al determinar lo contrario. No era necesario establecer dicho elemento del delito con certeza matemática. *Pueblo v. Bigio Pastrana*, supra.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita.

---

pruebas. No fue presentada ninguna otra prueba sobre la toma de las muestras de sangre, custodia de las mismas, o procedimiento efectuado, salvo lo declarado por el perito de su conocimiento general y los documentos sometidos, en ninguno de los cuales aparece su firma". Escrito en contestación a orden para mostrar causa, págs. 6–7. Aparte de que, generalmente, no consideramos en apelación los señalamientos de error que no fueron levantados en el foro recurrido —*Zalduondo v. Iturregui*, 83 D.P.R. 1, 12 (1961); *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411, 426 (1965)— la prueba pericial de cargo estableció que en las pruebas realizadas a las partes se siguieron los procedimientos y las más estrictas normas exigidas para esta clase de análisis.