Peñagarícano Soler, Jueza Ponente
TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el Presbyterian Medical Anesthesia Group & Respiration Care Services (en adelante, Presbyterian Anesthesia) con el recurso de apelación de epígrafe. Nos solicita revoquemos la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, TPI), el 6 de febrero de 2002, notificada el 26 de febrero de 2002. En dicha sentencia, el TPI desestimó la demanda incoada por la Presbyterian Anesthesia en contra del Fondo de Salud y Bienestar Unión Gastronómica (en adelante, el Fondo) por incumplimiento de contrato y daños. Contando con la comparecencia de las partes y estudiados los documentos que obran en autos, además del derecho aplicable, resolvemos confirmar la sentencia apelada.
I
El 27 de septiembre de 2000, el Presbyterian Anesthesia presentó demanda en contra del Fondo en reclamación de una suma ascendente a treinta y ocho mil quinientos quince dólares ($38,515.00) por incumplimiento de obligación contractual. Apéndice del Apelante, págs. 11-13.
La Presbyterian Anesthesia es la única sociedad de médicos que ofrece servicios de terapia respiratoria y anestesia en el Ashford Presbyterian Community Hospital (en adelante, Hospital Presbiteriano). Por su parte, el Fondo es una entidad que provee cubierta de seguro de salud, que incluye hospitalización, para miembros de la Unión Gastronómica Local 610 & A.M.H. El plan provisto por el Fondo se sustenta de fondos aportados por patronos, según negociado en los convenios colectivos de los unionados del Fondo.
Para el mes de diciembre de 1999, el Fondo entró en negociaciones con el Hospital Presbiteriano a los efectos de que este último fuera su proveedor de servicios médico-hospitalario para los miembros elegibles del plan. Durante dichas negociaciones, el Fondo estuvo representado por la Sra. Edmeé Aguayo (en adelante, Sra. Aguayo), quien, para aquel momento se desempeñaba como Administradora del Fondo. El Hospital estuvo representado por varias personas, entre ellas, el socio principal y Director Médico de la Presbyterian Anesthesia, el Dr. Belisario Matta De Juan (en adelante, Dr. Matta). Apéndice del Apelante, pág. 3.
Mientras las negociaciones progresaban, las partes acordaron, en lo pertinente, que el Hospital Presbiteriano, junto a sus servidores, le proveerían a los miembros cualificados del Fondo, servicios de *618 anestesia y terapia por medio de autorización particular escrita para cada caso referido. Apéndice del Apelante, pág. 17. Asimismo, acordaron que mientras continuaban las negociaciones, los servicios prestados serían satisfechos a base de las tarifas de Triple S.
El 24 de enero de 2000, la Sra. Jahira Román Rolón (en adelante, Sra. Román) fue admitida en la sala de emergencia del Hospital Presbiteriano, puesto que se disponía a parir. Esta era esposa del Sr. Alexander Díaz Torres, asegurado por el plan del Fondo. La Sra. Román parió una niña, la cual presentó complicaciones neonatales.
Así las cosas, la Presbyterian Anesthesia, quien había prestado servicios de anestesia a la Sra. Román, comenzó a suministrar terapias respiratorias a la bebé de ésta. Dichas terapias fueron provistas por un espacio de un mes, comenzando el 24 de enero de 2000 hasta el 24 de febrero de 2000. Las terapias practicadas fueron valoradas en treinta y ocho mil quinientos quince dólares ($38,515.00).
El 26 de enero de 2000, la Sra. Carmen Alamo (en adelante, Sra. Alamo), quien fungía en ese entonces como Gerente Administrativa de la Presbyterian Anesthesia, se comunicó con la Sra. Aguayo para informarle de los servicios que se estaban prestando a la menor. Por su parte, la Sra. Aguayo solicitó se le enviara copias de las facturas por los servicios prestados, sin especificar a cuáles se refería. Posteriormente, la Sra. Aguayo expresó a la Sra. Alamo, que hasta tanto se concretizara un contrato entre el Fondo y el Hospital Presbiteriano, la intención del Fondo era honrar los cargos según las tarifas de Triple-S.
El 27 de enero de 2000, la Sra. Aguayo envió facsímil al Hospital Presbiteriano el cual leía como sigue:

“Favor de facturar a tarifas CPT nuevo a base tarifas SSS. Nos comprometemos a pagar dentro de los 15 días a partir de la fecha de la factura recibida. ”

La antedicha autorización hacia referencia exclusivamente a los servicios recibidos por la Sra. Román. Apéndice del Apelante, pág. 100.
Mientras tanto, la Presbyterian Anesthesia continuó proveyendo las terapias a la bebé y se mantuvo enviando diariamente las facturas correspondientes a las mismas. No fue hasta el 29 de febrero de 2000 que la Sra. Aguayo expresamente indicó a la Presbyterian Anesthesia que el Plan del Fondo no cubría las terapias respiratorias de la bebé, debido a que el Plan, de forma expresa, excluia de su cubierta las complicaciones neonatales. Apéndice del Apelante, pág. 117. Véase además, Plan Médico del Fondo de Salud y Bienestar de la Unión, Art. VI, Sec. 34, Apéndice del Apelante, pág. 97. De igual manera, la Sra. Aguayo informó que era prerrogativa exclusiva de la Junta de Síndicos del Fondo el autorizar cualquier pago de servicios excluidos en el plan. Señaló, por tanto, que ella carecía, como Administradora, de la autoridad para hacer los pagos correspondientes de las terapias respiratorias brindadas a la bebé. A tenor con lo anterior, la Sra. Aguayó dirigió una carta al Hospital Presbiteriano, en la cual se comprometía a presentar ante la consideración de la Junta de Síndicos una modificación de la cubierta para cubrir cuidados neonatales, a base de un per diem regular que cubriría quince (15) días de terapia.
En tanto, la Presbyterian Anesthesia continuaba sus gestiones de cobro. El 10 de marzo de 2000, el Hospital Presbiteriano y el Fondo dieron por concluidas las negociaciones que se habían sostenido desde diciembre de 1999. Para ese entonces, el Fondo había pagado los servicios prestados a la Sra. Román, mas no así los prestados a su bebé.
Incoada la demanda, procedieron las partes a realizar su descubrimiento de prueba. Luego de varios incidentes procesales, el TPI celebró vista en su fondo los días 26 y 27 de junio y, 3 y 17 de julio de 2001.
*619 La controversia a ser considerada por el TPI, según presentada por el Fondo, consistía en determinar la existencia o inexistencia de un contrato que incluyera servicios neonatales a la bebé que nos ocupa. De concluir en la afirmativa, el monto de la deuda, si alguna. Por su parte, la Presbyterian Anesthesia sometió las siguientes controversias a la consideración del TPI: 1) Si cuando la demandante autorizó que se le prestara servicio de alumbramiento a la madre, autorizó con ello la prestación de servicios médicos al bebé, 2) Si la demandada le confirmó o no en varias ocasiones al demandante que le iba a pagar los servicios de terapias respiratorias prestadas a la bebé. Apéndice de la Apelante, págs. 27-28.
Desfilada la evidencia, el 4 de diciembre de 2001, notificada el 26 de febrero de 2002, el TPI emitió sentencia desestimando la demanda. El TPI consideró que la Sra. Aguayo en ningún momento se comprometió al pago, de las terapias respiratorias de la bebé, y aunque pudiera inferirse de su conducta que así lo había hecho, dicha actuación sería ultra vires. Ello, por cuanto la Administradora del Plan del Fondo no tenía autoridad real o aparente para comprometer al Plan del Fondo en un asunto que es de inherencia exclusiva de su Junta de Síndicos. Asimismo, concluyó que la Presbyterian Anesthesia sabía, por medio de su socio principal, el Dr. Matta, que el plan no cubría servicios neonatales, y que por tanto sabía o debió haber sabido que la Sra. Aguayo no poseía la autoridad para obligar al Fondo a cubrir los servicios neonatales provistos a la bebé. Apéndice del Apelante, pág. 1.
Así las cosas, el 6 de marzo de 2002, la Presbyterian Anesthesia presentó “Solicitud de Reconsideración”. En esencia, sostuvo que por un lado se podía interpretar que los servicios de terapia respiratoria de la bebé estaban incluidos en la cubierta del Plan del Fondo bajo hospitalización y cuidado de recién nacidos, que forma parte de los servicios de maternidad; y por otro lado, el mismo Plan excluía las complicaciones neonatales. Argüyó que ello creaba una inconsistencia en la interpretación del Plan. Esgrimió por tanto, que dicho Plan del Fondo, constituía un contrato de adhesión, y como consecuencia de ello, cualquier inconsistencia o duda surgida a raíz de su interpretación, debía resolverse en contra de la parte que redactó el contrato. Además, adujo que la Administradora del Plan del Fondo poseía la autoridad aparente e implícita para obligar a dicha entidad, como quedó demostrado en su testimonio, y por sus expresiones a lo largo de las negociaciones. Por último, argüyó que los principios de la buena fe obligaban al Fondo a resarcir los gastos incurridos por la Presbyterian Anesthesia, debido a que la primera esperó hasta finalizadas las terapias respiratorias para negarse a remunerar los servicios prestados. Apéndice de la Apelante, págs. 53-55.
Luego de varios incidentes procesales, el Fondo presentó, el 2 de junio de 2002, su “Réplica a Moción de Reconsideración de Sentencia y Otros Extremos”. En suma, adujo que la Presbyterian Anesthesia había planteado nuevamente fundamentos que no había podido probar durante la vista del caso, tal como que existía una promesa de pago. De igual forma, alegó que el planteamiento en cuanto al contrato de adhesión era un argumento nuevo, no levantado en su teoría del caso durante el juicio. Finalmente, sostuvo que los servicios provistos por la Presbyterian Anesthesia para estabilizar a la bebé constituían una obligación legal de ésta, que surge de su obligación de atender todo caso de urgencia, independientemente de la cubierta de una póliza que la persona pudiera poseer. Apéndice de la Apelante, págs. 67-70.
El 21 de junio de 2002, el TPI emitió Resolución denegando la solicitud de reconsideración presentada. Dicha Resolución fue notificada el 25 de junio de 2002. Apéndice de la Apelante, págs. 74-75.
Inconforme con la determinación del TPI, el 29 de julio de 2002, la Presbyterian Anesthesia presentó el recurso de Apelación de epígrafe. En el mismo señaló:

“PRIMER ERROR:

ERRO MANIFIESTAMENTE EL HONORABLE TRIBUNAL DE INSTANCIA AL APRECIAR LA PRUEBA EN EL PRESENTE CASO Y CONCLUIR QUE LA ADMINISTRADORA DEL FONDO NO TENÍA 
*620
AUTORIDAD PARA OBLIGAR A DICHA ENTIDAD.

SEGUNDO ERROR:

ERRO EL HONORABLE TRIBUNAL DE INSTANCIA AL NO APLICAR AL CASO EN AUTOS LAS DOCTRINAS DE LA BUENA FE, LOS ACTOS PROPIOS Y ENRIQUECIMIENTO INJUSTO. ’’

El 29 de agosto de 2002, notificada el 9 de septiembre de 2002, emitimos Resolución, en la que concedimos a las partes un término de cuarenta y cinco días (45) para que presentaran una exposición narrativa estipulada de la prueba testifical habida en el juicio.
El 24 de octubre de 2002, las partes presentaron la exposición narrativa solicitada, por lo que dimos por cumplida la orden por medio de Resolución emitida el 29 de octubre de 2002. Dicha Resolución fue notificada el 1ro de noviembre de 2002. Concedimos además, a la Presbyterian Anesthesia, un plazo de treinta (30) para presentar un alegato suplementario; dicho plazo a ser seguido por un término de treinta (30) días, concedido al Fondo para que para que fijara su posición.
Luego de una serie de incidente procesales, el 30 de junio de 2003, la Presbyterian Anesthesia presentó su alegato suplementario, en la que reiteraba posturas previamente esbozadas. Finalmente, el 14 de agosto de 2003, el Fondo compareció igualmente reiterando las objeciones antes planteadas ante el TPI. Estamos en posición de resolver. Así lo hacemos.
II
En el ámbito de las obligaciones y contratos, el perfeccionamiento de un contrato depende del mero consentimiento de las partes, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino a todas las consecuencias razonables que sean conforme a la buena fe, al uso y a la ley. Código Civil de Puerto Rico, Art. 1210, 31 L.P.R.A. sec. 3375.
Una acción u omisión voluntaria por la cual resulte incumplida una obligación anteriormente constituida da origen a la acción de daños contractuales, o ex contractus. Código Civil de Puerto Rico, Art. 1054, 31 L.P.R.A. sec. 3018; Trinidad v. Chade, 153 D.P.R. _, 2001 J.T.S. 10; Ramos v. Orientalist Rattan Furnt., Inc., 130 D.P.R. 712, 721 (1992); Santiago Nieves v. A.C.A.A., 119 D.P.R. 711, 710 (1987). Dicha acción se basa en el quebrantamiento de un deber, por lo cual dicha acción sólo tendrá lugar cuando exista un acuerdo de voluntades que genere una obligación, situación o estado de derecho resultante del convenio, que a la vez haya creado unas expectativas por las cuales las partes se condujeron de una manera particular. Trinidad v. Chade, supra. Las acciones ex contractus tienen por objeto que se cumplan las promesas intercambiadas de forma voluntaria por las partes. Trinidad v. Chade, supra; Ramos v. Orientalist Rattan Furnt., Inc., supra; Santiago Nieves v. A.C.A.A., supra.
Precisamente en el caso de autos, la determinación de si nos hallamos ante dicha figura jurídica, fue objeto de prueba ante el juzgador de hechos. La parte promovente de la acción, pues, estaba obligada a demostrar que, en efecto existía entre ellas una obligación contractual y que la actuación u omisión de la parte apelada, el Fondo, le había causado daños. Igualmente, que la parte apelante actuó bajo unas creencias razonables de que se le habría de efectuar el pago correspondiente.
Por otro lado, es norma afianzada en nuestro ordenamiento que el foro apelativo no intervendrá con las determinaciones de hechos o la apreciación de la prueba realizada por el foro de instancia, salvo la existencia de pasión, prejuicio, error manifiesto o parcialidad; que la apreciación de la prueba se aleje de la realidad fáctica o ésta sea inherentemente imposible o increíble. S.L.G. v. Nationwide Insurance Co., 156 D.P.R. _, 2002 J.T.S. 61; Belk v. Martínez, 146 D.P.R. 215, 232 (1998); Méndez v. Morales, 142 D.P.R. 26, 36 (1996); *621 Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900, 927-928 (1996); Coop. Seguros Múltiples de P.R. v. Lugo, 136 D.P.R. 203, 208 (1994); Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 63 (1991).
De este modo, el Tribunal Supremo de Puerto Rico se ha impuesto a sí mismo, y a todos los tribunales revisores, una norma de autolimitación, consistente en que las determinaciones de hechos de un tribunal de origen no podrán ser descartadas arbitrariamente, ni sustituidas por el criterio del tribunal apelativo, a menos que éstas carezcan de fundamento suficiente en la prueba presentada. Méndez v. Morales, supra; Pueblo v. Maisonave Rodríguez, supra, pág. 62. Ello, ya que de forma reiterada se ha insistido que los foros recurridos están en una mejor posición para apreciar la prueba. Ello es así, ya que aquilatar la credibilidad de los testimonios orales, por razón de que pueden ver y escuchar los testigos mientras prestan testimonio. S.L.G. v. Nationwide Insurance Co., supra; Pueblo v. Maisonave Rodríguez, supra. Esta función de los tribunales de primera instancia merece gran deferencia; a pesar de que ello, no presupone que estas determinaciones de hechos de dicho foro están exentas de error.
Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha expresado que: “[U]na apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este tribunal [Tribunal Supremo].” Méndez v. Morales, supra, pág. 36, citando de Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987). Lo cual implica que aunque haya evidencia que sostenga las determinaciones de hecho del Tribunal de Primera Instancia, se intervendrá con las mismas, si de un análisis de la totalidad de la evidencia, el foro revisor se convence que se ha cometido un error, por estar éstas en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la prueba presentada y admitida en evidencia. Méndez v. Morales, supra, pág. 36. Véase además, Oliveras, Inc. v. Universal Ins. Co., supra.
Ill
En el caso de marras, la Presbyterian Anesthesia señala la comisión de dos errores por parte del TPI. En primer lugar, que erró el tribunal en su apreciación de la prueba. En segundo lugar, que el TPI debió haber aplicado las doctrinas de la buena fe, los actos propios y enriquecimiento injusto. Atenderemos los señalamientos relacionados al primer error planteado.
Como dijéramos, de los hechos se desprende que la terapia respiratoria provista a la bebé de la Sra. Román fue suministrada desde el 24 de enero hasta el 24 de febrero de 2000. El 27 de enero de 2000, la Presbyterian Anestesia recibió autorización escrita enviada vía facsímil y suscrita por la Sra. Aguayo, para la facturación de los servicios prestados a la Sra. Román como parte de su alumbramiento. Nada dispuso en cuanto a los servicios de terapia respiratoria servidos a la recién nacida. Ello provocó dudas a Presbyterian Anestesia en torno al alcance de la cubierta del Fondo. El TPI tuvo ante sí la prueba que le permitió dilucidar si las actuaciones de la Sra. Aguayo comprometían expresamente al Plan a sufragar los gastos neonatales reclamados, a pesar de que el plan médico del Fondo específicamente los excluía.
El T.P.I., como juzgador de hechos, concluyó que el Dr. Matta, socio principal y Director Médico de Presbyterian Anesthesia, tenía conocimiento de que el Plan excluia de su cubierta las complicaciones neonatales. Por ello, Presbyterian Anesthesia sabía o debió haber sabido que la Sra. Aguayo no poseía la autoridad real o aparente, para efectuar promesa de pago o autorizar los pagos que constituían gastos extraordinarios, y que requerían de la aprobación de la Junta de Síndicos.
Resulta evidente y ello se desprende de un análisis ponderado y minucioso de los escritos y evidencia que obra en autos, que la controversia ante nos constituye inherentemente la apreciación de la prueba que realizó el T.P.I.; en particular, la credibilidad que le adjudicó a los testimonios presentados y admitidos en evidencia.
Como señaláramos anteriormente, es norma bien establecida en nuestro ordenamiento que, de ordinario, este Tribunal no intervendrá con la evaluación de la prueba o la credibilidad de los testimonios que le mereció *622 al magistrado de instancia. Lo anterior, ausente de la presencia de elementos que prueben que el TPI incurrió en error manifiesto, o que su determinación demuestra la presencia de pasión, prejuicio, parcialidad, o que se aleja de la realidad fáctica, o simplemente que sus conclusiones resultan increíbles.
La totalidad de la prueba desfilada ante el TPI, según consta en autos, demuestra que las determinaciones de hechos formuladas por el T.P.I. no resultan ser contradictorias. En contrario, son cónsonas a la totalidad de la prueba desfilada y a la credibilidad que ella le mereció al Tribunal. La mera alegación de que se podría concluir razonablemente lo contrario, resulta insuficiente en derecho, a los efectos de que un tribunal revisor descarte el criterio del juzgador de hechos que tuvo la oportunidad de ver y aquilatar la evidencia presentada por las partes. Más aún, y destacamos nuevamente que en el caso de autos, el criterio del T.P.I. descansa primordialmente en el testimonio oral ofrecido en el transcurso del juicio. Ello es así, ya que, el contrato entre las partes era uno verbal y, por ende, sujeto a interpretarse predicado en criterios de credibilidad. No se cometió el primer error señalado. Por las razones a que hemos llegado, resulta innecesario discutir el segundo error señalado.
IV
Por los fundamentos que anteceden, resolvemos confirmar la sentencia apelada.
Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIO 2003 DTA 153
1. Dicha Unión representa a empleados de la industria hotelera de Puerto Rico.