# 2008 DTA 87

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE CAGUAS/UTUADO**
**PANEL XII**

PUEBLO DE PUERTO RICO
Apelado

v.

JOSÉ JUAN FOLCH COLÓN C-P JOEL FOLCH
Apelante

Núm. KLAN-07-01290

San Juan, Puerto Rico, a 25 de junio de 2008

Panel integrado por su Presidenta, la Juez Pesante Martínez,
el Juez Escribano Medina y la Juez Hernández Torres

Pesante Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos, José Juan Folch Colón (apelante), conocido por Joel Folch, quien nos solicita que revisemos varias sentencias de 8 de agosto de 2007, emitidas por el Hon. Alvin D. Rivera Rivera, Juez del Tribunal de Primera Instancia, Sala Superior de Utuado (TPI). Mediante los referidos dictámenes, se le condenó al apelante a cumplir pena de reclusión de: 99 años por la comisión de asesinato en primer grado (Art. 106 del Código Penal); 18 meses por conspiración (Art. 249 del Código Penal); y además, por 2 infracciones al Artículo 5.15, una infracción al Artículo 5.10, y otra al Artículo 5.04 de la Ley de Armas, penas de 10, 10, 24 y 20 años respectivamente.

Inconforme con el resultado del proceso criminal llevado en su contra, el apelante acudió ante nos y señaló que el TPI cometió los siguientes errores. Primero, adujo que el TPI no debió haber admitido evidencia que, a su juicio, no era pertinente, y que además, alegadamente no fue debidamente autenticada. Lo anterior, lo planteó el apelante en relación a ciertos números telefónicos, registrados en documentación de las compañías proveedoras de los servicios de telefonía, y además, en los propios teléfonos celulares que alegadamente pertenecían a los implicados en el caso.

Segundo, el apelante cuestionó, básicamente, la suficiencia del testimonio del testigo principal en el caso, esto es, un co-conspirador que aceptó un acuerdo de inmunidad, quien, además, aceptó que fue quien disparó contra la víctima involucrada en el caso. Sobre este particular, el apelante sugirió que debió presentarse prueba corroborativa del testimonio del referido co-conspirador. Adujo que el testimonio de aquél fue impugnado por el de otro co-conspirador que declaró en el juicio. También, mencionó que el referido co-conspirador cambió su versión de los hechos durante el proceso.

Tercero, el apelante alegó que el TPI se sirvió incorrectamente de prueba de referencia. Indicó que debió excluirse como prueba de referencia inadmisible, el testimonio de uno de los agentes que intervino en el caso. Según el apelante, el agente lo que hizo fue reiterar el relato de los hechos según se lo expresó el co-conspirador a quien se le concedió la inmunidad. El apelante intimó que el testimonio del agente se presentó para reforzar el testimonio, alegadamente no confiable, del referido co-conspirador.

Cuarto, el apelante cuestionó la apreciación de la prueba que hizo el TPI. Señaló, en resumen, que no se aquilató adecuadamente el testimonio de uno de los alegados co-conspiradores. Según el apelante, este otro co-conspirador atestiguó que nunca se dieron las reuniones para ultimar el plan para dar muerte a la víctima en el caso. Indicó que este testigo declaró que tampoco se llevaron transacciones para acordar lo que pagaría el apelante a los demás implicados para llevar a cabo el plan. El apelante argumentó, además, que el testimonio de la hermana y madre de la víctima demostró que el co-conspirador con la inmunidad había incluso amenazado de muerte a la víctima en fecha anterior a los hechos.

También, el apelante alegó que quedó en entredicho la versión del co-conspirador con inmunidad, sobre el lugar y el día en que alegadamente se llevó a cabo la conspiración, pues aquél tenía un grillete electrónico, y alegadamente, no se registró la señal de que había salido del perímetro permitido ese día. Sobre este particular, destacó el testimonio que brindó una oficial de la Oficina de Servicios con Antelación al Juicio. Finalmente, el apelante argumentó que no se presentó prueba: de que medió, de su parte, intención para causar la muerte de la

víctima; de que tenía conexión con la conspiración para tal fin; como tampoco de que poseyó o proveyó las armas de fuego que se utilizaron para tal asunto.

Luego de examinar los argumentos del apelante, le ordenamos que presentara la transcripción de la prueba oral. También, le dimos la oportunidad al Procurador General para que se expresara. Las partes cumplieron con lo ordenado. Con el beneficio de la transcripción de la prueba y de los argumentos de las partes, resolvemos. Adelantamos que confirmamos los dictámenes apelados.

## I

Entre los testigos que declararon en el juicio que se llevó a cabo contra el apelante, se destaca Arnaldo J. Cintrón Franco (Cintrón Franco). Este último vivía en el Residencial Leonardo Santiago en Juana Díaz. Indicó que se dedicaba al bajo mundo. Agregó que trabajaba en el punto de drogas que operaba en el referido residencial, el cual, según indicó, era dirigido por el apelante (Joel Folch, a quien también se refería como Papá).

Cuando se le preguntó por el tipo de trabajos que realizaba en el punto, contestó que "*sacar la gente de frente*" del apelante. **Especificó que el apelante le pagaba para asesinar a las personas con las que tenía problemas. [1] Cintrón Franco testificó que al menos en tres ocasiones anteriores ya había participado en asesinatos por encargo del apelante. Explicó que el apelante era quien le proveía las armas. También detalló las cantidades de dinero que había recibido en pago por los "*trabajos*". [2]**

**Señaló que en el punto también trabajaba Julio (Julio Santiago Sánchez; Bertito), y además, Chonchi, que era un sobrino del apelante. Según indicó, el apelante lo contrató para matar a Pedro Santana.** Este último, operaba un punto de drogas en un residencial público de Adjuntas. Indicó que Pedro Santana (Peter), estaba obsesionado con el punto de drogas del apelante.

Declaró Cintrón Franco que, alegadamente, Peter había intentado asesinar al apelante. De hecho, por las heridas de bala en una ocasión, el apelante fue recluido en el hospital. Según expresó, estos hechos se dieron para febrero de 2007. Posteriormente, cuando el apelante salió del hospital, "*en la cancha [...] detrás de la oficina*" **del residencial en el que residían el apelante y Cintrón Franco, se reunieron y pactaron los detalles del plan para matar a Peter.** Según explicó Cintrón Franco, el apelante le pagaría **$20,000 a él y a Bertito** ($10,000 para cada uno). Cintrón Franco dijo que el apelante les indicó que tenía que matar a Peter, porque si no, este último lo mataría a él. **[3] La planificación se dio dos o tres días antes de los hechos**.

Cintrón Franco declaró que el apelante había hecho contacto con una muchacha que vivía en el residencial de Adjuntas (Loraine Montañez). **Cuando se le llamara, ésta les informaría sobre la ubicación de Peter dentro del residencial.** Luego de que se atentara contra Peter, ésta informaría si en efecto estaba muerto o no. Apuntó Cintrón Franco que a la muchacha (Loraine), el apelante le pagaría **$5,000. [4]**

**Agregó Cintrón Franco que, como parte del plan, el apelante le dio dinero a Bertito para que comprara un vehículo.** Bertito compró un Suzuki Aerio gris en un residencial público cercano. Alegadamente, el apelante no podía negociar directamente con las personas de ese caserío y Bertito era su contacto para esas transacciones. **[5]**

En cuanto al día de lo hechos, esto es, el 26 de marzo de 2007, Bertito y Cintrón Franco se dirigieron al residencial en Adjuntas. Adujo Cintrón Franco que recibió unas llamadas del apelante. **Indicó cuál era el número del apelante. Alegadamente, el número del apelante aparecía identificado en su celular bajo el nombre de "*Papá*". [6]** Explicó que así le llamaba porque era el más que mandaba, esto es, era el jefe. [7]

De camino a Adjuntas, el apelante les dio el número de Loraine para que aquélla les informara si Peter estaba en el residencial, y de estar, les especificara en qué lugar en particular. **[8]** Cintrón Franco identificó el número

que el apelante les indicó que era de la muchacha (Loraine) - 462-0446. Reiteró que ya el apelante había hablado con ella para ubicar a Peter. Cintrón Franco llamó a Loraine y ésta le indicó que Peter estaba en el residencial. **[9]** Loraine le dio la ubicación y descripción de la vestimenta que tenía Peter.

Cintrón Franco dijo que, antes de llegar al residencial en Adjuntas, mediaron llamadas entre el apelante y ellos para comentar sobre el hecho de que Peter estaba en el residencial. Llegando al residencial, volvieron a llamar a Loraine para confirmar si Peter aún se encontraba. Cuando finalmente llegaron al residencial, volvieron a llamarla. Indicó que llegaron en el Suzuki Aerio gris. Apuntó que él iba en el asiento del pasajero y que Bertito conducía. **[10]**

Señaló que tenían abajo los cristales delanteros del vehículo. Se acercaron al lugar en el que Peter estaba sentado. Bertito inclinó hacia atrás el asiento, y entonces, Cintrón Franco se acomodó encima de Bertito. Seguido, apoyó las armas de fuego sobre la puerta (donde el cristal sube) y comenzó a dispararle a Peter. Indicó que con Peter había un grupo de muchachos que también *"cogieron tiros"*. Indicó que esos hechos ocurrieron entre las 2:25 p.m. a 2:30 p.m. **[11]** Entonces, salieron del residencial. Indicó que hizo dos llamadas a Loraine para que les confirmara si Peter había muerto. Aquélla les indicó que sí. Reiteró a qué número fue que la llamó. También, señaló que llamó al apelante para indicarle que había completado *"el trabajo"*. **[12]**

Salieron del residencial por la carretera Número 10 hacia Ponce. Explicó que recibieron unas llamadas del apelante, quien les manifestó que en el camino, Chonchi (Johnatan; sobrino del apelante) los recogería en otro vehículo y además se encargaría de quemar el Suzuki Aerio.

En el camino, advirtieron que un helicóptero estaba rondando el área. Alegadamente tuvieron una comunicación con Chonchi para ver si tenía información sobre el particular. **[13]** Indicó que Chonchi debió recogerlo, pero que nunca llegó. **[14]**

Posteriormente, se toparon con agentes que estaban bloqueando la carretera. Éstos se metieron por una salida en contra del tránsito. Se dirigían al lugar donde residía Chonchi. Llegaron a unas casas. Salieron corriendo del vehículo, se escondieron dentro de las casas, pero los agentes buscaron, los encontraron y arrestaron. **[15]**

Después, los llevaron a un cuartel de la policía en Ponce. A Cintrón Franco lo llevaron al hospital, pues en la persecución sufrió un golpe en la cabeza. Le administraron un medicamento para el dolor, y luego, lo regresaron al cuartel. De ahí lo llevaron a Utuado, donde lo estaban esperando el agente Rivera Rossi y el agente Plaza. Éstos, lo llevaron a Fiscalía. Entonces Cintrón Franco le indicó al agente Rivera Rossi que quería declarar. Le narró todo lo que había pasado, **aunque explicó que por miedo *"a que no le dieran inmunidad"* le dijo que Bertito fue el que había disparado. Luego, según indicó, decidió decir la verdad. Esto es, aclaró que todos los hechos que declaró en una primera declaración jurada estaban correctos, salvo por el hecho de que Bertito no fue quien disparó, sino él. Por ello, hizo otra declaración jurada. [16]**

A preguntas del Ministerio Público respondió que fue confrontado por el agente Rivera Rossi con las llamadas que aparecían registradas en su celular. **[17]** Declaró que hablaron sobre las llamadas que hizo y las que recibió en momentos antes y después de los hechos. Adujo que aparecían los números identificados por los nombres de las personas que llamaron o que recibieron llamadas. **[18]**

Por otro lado, explicó que el celular que usó no estaba a su nombre. **[19] Además, que el teléfono que usaba el apelante estaba a nombre de su hermano (Luis Arnaldo Cintrón Franco). [20] Aclaró que su hermano, que tenía crédito, pudo sacar una oferta con tres líneas, y una de ellas era la del apelante. [21]** Explicó que entre las personas que están implicadas en el bajo mundo así se acostumbra, esto es, no tener la cuenta de los teléfonos a su nombre. Finalmente, declaró que el 26 de marzo de 2007 nadie más que él usó su teléfono celular. **[22]**

Durante el juicio, el Ministerio Público solicitó que se le mostrara a Cintrón Franco el *subpoena* que se tramitó contra Luis Cintrón Franco (hermano del primero), en relación al celular con número 202-2910. La representación legal del apelante objetó. Argumentó que no podían presentarse documentos de la compañía proveedora del servicio de teléfono celular con el registro de llamadas de un teléfono celular que aparecía a nombre de una persona que no era parte en el caso y que no se llamaría a testificar. Alegó que se pretendía presentar esa documentación para probar que las llamadas se hicieron entre las personas que decía Cintrón Franco. **[23]** Arguyó que era prueba de referencia que se traía para probar la verdad de lo aseverado por Cintrón Franco.

El TPI descartó el argumento y comentó que ya Cintrón había vertido su testimonio de que el teléfono estaba a nombre de su hermano, y que el que tenía el número 202-2910 era el celular que usaba el apelante. Estimó que no era necesario que se le presentaran los documentos en cuestión a Cintrón Franco para que se probara la pertinencia de los mismos. Los documentos, adujo el TPI, estaban preparados por la compañía de teléfono, y estimó el TPI, que sólo complementaban lo que ya había declarado Cintrón Franco. El TPI indicó que el documento era admisible.

**Ahora bien, destacó el TPI que la cuestión de si se podía entender probado que en efecto las llamadas las realizaron las personas aludidas por Cintron Franco, era un asunto de credibilidad basado en el testimonio de aquél. El TPI destacó que ese documento no era la única prueba que se tenía en el caso, que evaluarían toda la evidencia y daría el peso de credibilidad que estimara meritorio a cada pieza evidenciaría. [24]**

**En sala, se logró encender el teléfono celular que Cintrón Franco identificó como suyo.** El juzgador verificó, junto con el Ministerio Fiscal y la representación legal del apelante, el **registro de llamadas** que aparecía guardado en la memoria del celular. Reveló el registro que, entre las llamadas que se generaron o se recibieron del referido celular el día de los hechos, y en momentos antes y después de los sucesos, estaban los números de "*Papá*" y otro como 462-0446 (el de Loraine). **[25]**

Por otro lado, declaró en el juicio Flor Soto Acevedo, trabajadora social y supervisora de la Oficina de Servicios con Antelación al Juicio (OSAJ). **[26]** El TPI advirtió que Cintrón Franco estuvo bajo la supervisión de OSAJ, pero en la región de **Ponce.** Destacó, no obstante, que **Soto Acevedo era supervisora en Utuado.** **[27]**

A Soto Acevedo se le mostró un documento que identificó como un "*informe de letras*". Declaró que cuando una persona tiene un grillete instalado, y está sujeto a determinado perímetro, en documentos como el que se le presentó se registra la alerta indicativa de que la persona con grillete salió del perímetro, y si lo hizo con o sin autorización. **[28]**

El documento que se le presentó era del 26 de marzo de 2007 y del 27 de marzo de 2007. Comentó, también, que en relación al individuo al que refería el documento que se le mostró, **no sabía qué perímetro le establecieron cuando le instalaron el grillete.** Indicó que el máximo que puede extenderse un perímetro es **entre 100 a 200 pies. [29]** Este testigo lo presentó la representación legal del apelante.

Concluido el interrogatorio, el Ministerio Fiscal destacó que aunque se presentó el documento, no se solicitó que se marcara como exhibit. Destacó, además, que **no se sentaron las bases respecto al sujeto con grillete al que se refería el documento. El TPI estuvo de acuerdo conque no se estableció a quién se refería el documento. [30]**

Julio Santiago Sánchez (Bertito) también declaró durante el juicio. Reconoció que fue acusado por los mismos hechos imputados al apelante y a Cintrón Franco. **[31]** Indicó que, en efecto, vivían en el mismo

residencial que Cintrón Franco (Residencial Leonardo Santiago en Juana Díaz). [32]

La representación legal del apelante, básicamente, se limitó a preguntarle si esperaba recibir algo por asesinar a Peter. Respondió que no esperaba **nada** a cambio. Se le preguntó lo mismo respecto a Cintrón Franco (si éste esperaba recibir algo a cambio). Repitió su contestación. Entonces se puso el testigo a la disposición del Ministerio Público. [33]

Cuando comenzó el Ministerio Público a interrogar a Bertito, la representación legal del apelante presentó oposición. **El TPI destacó que al haber presentado a Bertito como testigo para impugnar a Cintrón Franco, el apelante abrió las puertas para que se contrainterrogara a Bertito sobre su versión de los hechos, aunque, nada de eso se hubiera preguntado en el interrogatorio directo.** El TPI determinó que permitiría las preguntas del Ministerio Público para, entonces, **adjudicar credibilidad y decidir si le creía a Bertito o a Cintrón Franco. [34]**

A preguntas del Ministerio Público, Bertito reconoció que se le presentaron cargos e hizo alegación de culpabilidad por asesinato, tentativa de asesinato, Ley de Armas y **conspiración. [35]** Admitió que los mismos cargos se presentaron contra el apelante y contra Cintrón Franco. **Se le preguntó en qué consistía el cargo de conspiración. Respondió que se le imputó ese cargo por habérsele ofrecido _"chavos"_ por la muerte de Peter.** Se le increpó de cómo es que si no esperaba recibir nada a cambio por la muerte de Peter, se declaró culpable del cargo de conspiración. Adujo que _"no es que no esperaba recibir nada"_. [36]

Además, Bertito reconoció que el **agente Rivera Rossi** había ido a hablar con él mientras estuvo recluido en Ponce. **No obstante, aclaró que le indicó al agente que no iba a decir cosa alguna respecto a los hechos. Estuvo de acuerdo que, después de esas conversaciones, fue que se le presentaron los cargos. [37]** Por último, indicó que se declaró culpable porque entendía que _"15 años [...] eran bueno [sic.]para los casos que me estaban sometiendo"_. [38]

Tomando en cuenta lo anterior, discutimos el derecho aplicable.

## II

### A

En nuestro ordenamiento penal, **la culpabilidad de una persona acusada de delito tiene que ser demostrada, más allá de duda razonable, con prueba suficiente en derecho.** Este principio responde a las garantías constitucionales, la presunción de inocencia y el debido proceso de ley. _Pueblo v. Irizarry_, 156 D.P.R. 780 (2002); _Pueblo v. De León Martínez_, 132 D.P.R. 746 (1993). Es al Estado a quien le compete presentar evidencia suficiente para demostrar la culpabilidad del acusado más allá de duda razonable. _Pueblo v. Irizarry_, _supra_; _Pueblo v. Rosaly Soto_, 128 D.P.R. 729 (1991). Para poder encontrar culpable de la comisión de un delito al acusado, **la prueba necesaria a ser ofrecida por el Ministerio Público y admitida, además de suficiente, tiene que ser prueba satisfactoria, que produzca en el juzgador certeza o convicción moral en una conciencia exenta de preocupación.** _Pueblo v. Irizarry, supra_; _Pueblo v. Carrasquillo_, 102 D.P.R. 545 (1974).

### B

Al evaluar las declaraciones que los testigos hacen ante un tribunal, debe tenerse presente que la Regla 10 (D) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(D), establece que _"[l]a evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga"_.

### C

Tanto en causas criminales como civiles es norma reiterada que las determinaciones de hechos y **la adjudicación de credibilidad que hace un tribunal de primera instancia son merecedoras de gran**

**deferencia por parte de los tribunales apelativos**. Un tribunal apelativo, de ordinario, no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha hecho el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. *In re: Ruiz Rivera*, res. el 28 de junio de 2006, **2006 JTS 116**; *Álvarez de Choudens v. Rivera*, res. el 17 de junio de 2005, **2005 JTS 90**; *López Delgado v. Cañizares*, res. el 5 de octubre de 2004 , **2004 JTS 165**; *Pueblo v. Maisonave*, 129 D.P.R. 49, 62-63 (1991).

En el encausamiento criminal, la apreciación que hace un juzgador de la evidencia desfilada durante el proceso judicial es una cuestión mixta de hecho y de derecho. **Esa es la razón por la cual el análisis que de la prueba presentada se realiza** *"pone en movimiento, además de la* <u>*experiencia del juzgador,*</u> <u>*su conocimiento*</u> <u>*del Derecho para así llegar a una solución justa del caso.*</u>" *Pueblo v. Irizarry, supra*; *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988).

Por esto es que debemos tener presente que es norma jurisprudencial reiterada que **la determinación de culpabilidad que hace el juzgador de los hechos a nivel de primera instancia es merecedora de gran deferencia** por parte del Tribunal Apelativo. El fundamento o base de mayor peso en que se apoya esta norma es que dicho **juzgador** es el que, de ordinario, **está en mejor posición para aquilatar la prueba testifical, ya que fue el que escuchó y vio declarar los testigos.** *Pueblo v. Irizarry, supra*; *Pueblo v. Maisonave, Rodríguez, supra*.

Se ha expresado en repetidas ocasiones que, de ordinario, **no debemos intervenir con** el veredicto condenatorio emitido por un jurado o **el fallo de culpabilidad de un Juez en ausencia de pasión, prejuicio, parcialidad o error manifiesto en la apreciación que de la prueba fue realizada.** *Pueblo v. Irizarry, supra*; *Pueblo v. Rivero, Lugo y Almodóvar, supra*; *Pueblo v. Borrero Robles*, 113 D.P.R. 387 (1982); *Pueblo v. Millán Meléndez*, 110 D.P.R. 171 (1980); *Pueblo v. López Pérez*, 106 D.P.R. 584 (1977).

De hecho, se ha reconocido que aun cuando un testigo incurra en contradicciones o inconsistencias, como puede ser cuando se trata de detalles y hechos los cuales la mente puede confundir, **el juzgador de los hechos tiene la facultad para resolver el valor que dará a su testimonio al evaluarse la totalidad del mismo.** *Flores v. S.L.G.*, 146 D.P.R. 45 (1998); *Pueblo v. Ramos Miranda*, 140 D.P.R. 547 (1998); *Pueblo v. Ramos Álvarez*, 122 D.P.R. 287, 317 (1998); *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 656 (1986); *Pueblo v. Cruz Negrón*, 104 D.P.R. 881, 883 (1976).

### D

El Código Penal tipifica el asesinato como el dar muerte a un ser humano con intención de causársela. 33 L. P.R.A. 4733. La muerte puede ser causada mediante **actos u omisiones**, realizados de **múltiples formas** y por **distintos medios**, entre ellos, armas de fuego.

El elemento mental requerido para el asesinato es la intención de matar. <u>**La intención es un elemento de hecho a ser determinado por el juzgador de hechos**</u>. Para tal determinación, deberá atender a los **hechos, actos y circunstancias que rodean la muerte,** la capacidad mental, <u>**motivación**</u>, manifestaciones y conducta de la persona, y luego de evaluar todo lo anterior, <u>**inferir**</u> **racionalmente si hubo intención de matar o no.** El uso de un arma puede implicar razonablemente la intención de matar. *Nuevo Código Penal De Puerto Rico*, Comentado por Dora Nevárez Muñiz, Edición 2004-2005, Instituto para el Desarrollo del Derecho, Inc., a las páginas 129-130.

### III

En este caso, no se cometieron los errores señalados por el apelante. Advertimos que los cinco errores planteados se dirigen, en una u otra forma, a atacar la apreciación de la prueba, y en particular, a cuestionar el valor probatorio que concedió el TPI al testimonio del testigo Cintrón Franco. Un análisis de la transcripción de

la prueba oral nos convence de que éste fue el testigo principal en el caso.

El TPI se sirvió principalmente en ese testimonio para rendir su fallo condenatorio, y eventualmente, para dictar sentencia contra el apelante. Rendimos deferencia al dictamen del TPI. Independientemente de que el testimonio del referido testigo hubiera mostrado inconsistencias o contradicciones, estamos seguros de que el TPI hizo un examen concienzudo de las declaraciones en su totalidad, y le dio el valor probatorio que le mereció. No encontramos visos de error, pasión, prejuicio o parcialidad en la determinación del TPI.

En lo que respecta al primer y segundo error señalado, advertimos lo siguiente. El TPI dio mayor peso a la credibilidad que le mereció el testimonio de Cintrón Franco respecto a las llamadas que se generaron entre aquél, el apelante y el resto de los implicados en la conspiración. El TPI tuvo la oportunidad de escucharle y observar su *demeanor* mientras declaró. También, el TPI examinó el teléfono celular que identificó Cintrón Franco como suyo. De primera mano, el TPI pudo observar el registro de llamadas realizadas y recibidas el día de los hechos. Tuvo la oportunidad de analizar esa información con el testimonio vertido por Cintrón Franco. A base de esa información, llegó a sus conclusiones.

Examinamos la parte de la trasncripción relacionada a este particular. No percibimos error en el proceder del TPI. Estimamos que dio mayor peso a esta **prueba directa** que presentó el Ministerio Público para probar que el plan que culminó con la muerte de Peter, fue objeto del previo contubernio del apelante con Cintrón Franco, Bertito, Loraine y Chonchi. Las llamadas a las que refirió Cintrón Franco en su testimonio coincidían con las registradas en su celular. La información relacionada a ese particular, que se desprendería de los documentos emitidos por las compañías proveedoras de servicio de los celulares de los implicados, en última instancia, podían reputarse como prueba circunstancial y acumulativa frente al testimonio que ofreció Cintrón Franco y al examen de su teléfono celular.

Por otro lado, entendemos el malestar del apelante conque al testimonio de Cintrón Franco se le haya dado tanto peso probatorio. Máxime, cuando a éste se le concedió inmunidad para que declarara sobre los hechos que incriminaron al apelante. También entendemos su inconformidad con el hecho de que aquél hubiera prestado dos declaraciones juradas, en las cuales, uno de los elementos de la declaración fue inconsistente. Nos referimos al asunto de que en la primera, declaró que fue Bertito quien disparó y en la otra aclaró que fue él.

No obstante, el representante legal del apelante tuvo amplia oportunidad para puntualizar este asunto. Se cuestionó a Cintrón Franco sobre el particular, éste ofreció su justificación para el cambio de versión, y el juzgador de los hechos, que en este caso no fue un jurado lego, sino el juez, ejerció su facultad para resolver el valor que le merecía su testimonio al evaluar en su totalidad las declaraciones del referido testigo.

De un análisis del expediente, no dudamos que el juzgador emitió su determinación responsablemente, **equilibrando su experiencia con su conocimiento del Derecho**. Además, la alegada inconsistencia en nada alteró los hechos declarados por Cintrón Franco en cuanto a la participación y relación del apelante en la fase preparatoria y concomitante del plan para matar a Peter (en la conspiración).

Ni el tercer ni el cuarto error se cometieron tampoco. Llamamos la atención al hecho de que en el segundo error, el apelante indicó que el Ministerio Público debió presentar prueba que corroborara el testimonio de Cintrón Franco. Mientras, en el tercer error, planteó que no debió admitirse el testimonio del agente Rivera Rossi porque se presentó en el ánimo de corroborar el testimonio de Cintrón Franco. Es incongruente el argumento del apelante.

El planteamiento del apelante en nada afecta nuestra determinación de rendir deferencia a las determinaciones y conclusiones a las que llegó el TPI. El referido foro se sirvió adecuadamente de su experiencia y conocimiento del Derecho a la hora de apreciar y aquilatar el testimonio de Cintrón Franco, el

testigo principal del caso, conspirador y coautor de los hechos relacionados al caso, y a quien se le concedió inmunidad. Estamos seguros de que, en este caso, el TPI cumplió con lo establecido en la Regla 156 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 156; esto es, examinó el testimonio de Cintrón Franco con desconfianza y con cautela a la luz de toda la evidencia presentada, y así, le otorgó el valor probatorio que merecía.

Por otro lado, también descartamos el argumento de que no debió permitirse la presentación del testimonio del referido agente, por alegadamente caer bajo la regla general de exclusión de prueba de referencia. Estimamos que no se erró en permitir estas declaraciones, las cuales, alegadamente, referían a las manifestaciones que hizo Cintrón Franco al agente.

En este caso, no había el riesgo de que se trastocara el derecho del apelante a la confrontación. Como se sabe, este es uno de los objetivos principales de la prohibición general a que se presente prueba de referencia. Como bien reconoce el apelante, las declaraciones a las que referiría el agente eran las de Cintrón Franco. Ahora bien, a este último se le produjo como testigo en el juicio y estuvo sujeto a un amplio contrainterrogatorio por la representación legal del apelante. En fin, el apelante tuvo oportunidad de carearse con Cintrón Franco.

Valga añadir que, contrario a como sugirió el apelante en su cuarto error, lo que quedó en entredicho fue la suficiencia del testimonio del co-conspirador Bertito, y además, de la oficial de la OSAJ. El primero, inicialmente respondió que no medió transacción o acuerdo entre Cintrón Franco, el apelante y él para matar a Peter. Negó, igualmente, que el apelante les hubiera ofrecido algo a cambio para que se llevara a cabo el plan de asesinar a Peter. No obstante, reconoció que se le acusó de conspiración por haberle ofrecido dinero al apelante para darle muerte a Peter, y en ese entendido, éste hizo alegación de culpabilidad por el delito de conspiración. Quedó claro que no negó que conspiró para dar muerte a Peter.

Por otra parte, en cuanto a la oficial de OSAJ, ésta no vertió expresiones que directamente se refirieran a Cintrón Franco. Su testimonio no pudo establecer que Cintrón Franco tenía un grillete y que estaba sujeto a determinado perímetro. Tampoco pudo establecer aquélla si el lugar al que aludió Cintrón Franco que se planificó o se conspiró para darle muerte a Peter estaba fuera de su perímetro de movimiento. Menos pudo afirmar que el día en que según Cintrón Franco se articuló el plan, se hubiera reflejado o no una alerta de que salió de su perímetro. **Distinto a como sugirió el apelante, no vemos en qué medida estos testimonios minaron la credibilidad que le mereció al TPI el testimonio de Cintrón Franco.**

Por último, destacamos que el testimonio de la madre y hermana de la víctima, al que aludió el apelante, en efecto refirió a que Cintrón Franco les indicó que mataría a Peter. Ahora bien, cuando analizamos los testimonios ofrecidos, notamos que la relación de Cintrón Franco con el apelante era la de matar a sueldo a las personas que le encargara el segundo. Esto es, inferimos razonablemente que Cintrón Franco era lo que comúnmente se conoce como un "*gatillero*", y además, que trabajaba para el apelante.

Surgió de la prueba que Peter había atentado contra la vida del apelante. Por tal motivo, y según la prueba creída por el TPI, el apelante ordenó a Cintrón Franco a que matara a Peter. De acuerdo a las expresiones de los testigos, lo que expresó Cintrón Franco a la hermana y madre de Peter fue precisamente que le iban a pagar para matarlo. De hecho, también surgió que, alegadamente, por encargo del apelante, Cintrón Franco atentó contra el esposo de la hermana de Peter (de nombre Jairo).

Esta prueba testifical, lejos de evidenciar motivación o animosidad por parte de Cintrón Franco para matar a Peter, refuerza la teoría que se estimó probada en este caso, esto es, que el apelante tenía la intención de matar a Peter, y ello, de acuerdo al plan que ingenió, para cuya ejecución, contrató a Cintrón Franco, Bertito y Loraine. Por tanto, concluimos que de los hechos, actos y circunstancias que rodearon la muerte de Peter (conseguir un

contacto de informara sobre su ubicación, proveer armas de fuego, comprar un vehículo para perpetrar los hechos y luego disponer de él), y la motivación que pudo entenderse se había creado entre las partes implicadas en el caso, el TPI pudo inferir razonablemente que en este caso medió intención del apelante, junto con los demás acusados, para matar a Peter. No se cometió el quinto error señalado.

## IV

En mérito de lo anterior, confirmamos las sentencias condenatorias apeladas.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. María E. Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 87

1. Transcripción de la Prueba Oral de la vista del 2 de agosto de 2007, páginas 72-73.

2. *Id.*, paginas 74-77.

3. *Id.*, páginas 78-79.

4. *Id.*, pág. 91.

5. *Id.*, 110-111.

6. *Id.*, páginas 80-81.

7. *Id.*, pág. 82.

8. *Id.*, pág. 83.

9. *Id.*, pág. 84.

10. *Id.*, páginas 85-86.

11. *Id.*, páginas 86-88.

12. *Id.*, páginas 89-91.

13. *Id.*, pág. 94.

14. *Id.*, pág. 96.

15. *Id.*, páginas 98-100.

16. *Id.*, páginas 101-105

17. *Id.*, pág. 125.

18. *Id.*, pág. 129.

19. *Id.*, pág. 130.

**20.** *Id.*, páginas 132-133.

**21.** *Id.*, pág. 144.

**22.** *Id.*, páginas 133-134.

**23.** *Id.*, páginas 144- 150.

**24.** *Id.* páginas 147- 149.

**25.** *Id.*, pág. 161.

**26.** Transcripción de la Prueba Oral, vista del 3 de agosto de 2007, pág. 148.

**27.** *Id.*, pág. 149.

**28.** *Id.*, pág. 154.

**29.** *Id.*, páginas 156-157. Valga mencionar que en la transcripción de la vista del 2 de agosto de 2007, página 172, Cintrón Franco declaró que la planificación de los hechos fue **entre la cancha y la oficina de la administración del residencial** en el que alegadamente residían el apelante y él. **Adujo que la distancia entre su casa y el lugar era de unos 4 a 5 metros.**

**30.** *Id.*, pág. 158.

**31.** *Id.*, pág. 161.

**32.** *Id.*, pág. 162.

**33.** *Id.*, pág. 164.

**34.** *Id.*, páginas 162-165.

**35.** *Id.*, pág. 167.

**36.** *Id.*, páginas 170-171.

**37.** *Id.*, páginas 168-169.

**38.** *Id.*, pág. 172.