ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>RAYMOND CASILLAS WALKER<br><br>Apelante | KLAN202301014 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm.:<br>F IS2022G0060<br>F IS2022G0061<br>F IS2022G0062<br><br>Sobre:<br>ART. 133 (A) CP<br>(3 cargos) |

Panel integrado por su presidenta la Jueza Ortiz Flores, la Jueza Rivera Pérez y la Jueza Prats Palerm[1].

*Prats Palerm, Jueza Ponente*

### SENTENCIA

En San Juan, Puerto Rico, a 31 de octubre de 2024.

Comparece Raymond Casillas Walker ("Casillas Walker" o "Apelante") mediante *Apelación Criminal* y solicita la revisión de la *Sentencia* emitida el 24 de octubre de 2023, por el Tribunal de Primera Instancia, Sala de Carolina ("TPI"). Mediante el referido dictamen, el TPI sentenció al Apelante a quince (15) años de prisión por el delito de actos lascivos contra una menor, tipificado por el Artículo 133 (a) del Código Penal 33 LPRA sec. 5194.

Por los fundamentos que expondremos a continuación, se *Confirma* el dictamen apelado.

### I.

Por hechos acontecidos en el 2019, el Ministerio Público presentó siete (7) acusaciones por violación al Artículo 131 del Código Penal, 33 LPRA sec. 5192, y tres (3) acusaciones por infracción al Artículo 133 (a)

---

[1] *Véase, OATA 2023-212*

Número Identificador
SEN2024_____

del Código Penal, *supra*, contra Casillas Walker, por actos lascivos en contra de la menor GMS, quien al momento de los actos tenía entre nueve (9) a diez (10) años.

Tras los trámites de rigor, los días 7, 8 y 10 de febrero de 2023; 13, 14 y 15 de marzo de 2023; 3 y 21 de abril de 2023; 8 de mayo de 2023, y; el 23 de junio de 2023, se celebró el juicio en su fondo, por tribunal de derecho. Durante el juicio, el Ministerio Público presentó los siguientes testigos de cargo: (1) el Agte. Ismael Aguilar Carmona ("Agte. Aguilar Carmona"); (2) GMS; (3) la abuela paterna de GMS; (4) la tía de GMS; (5) la madre de GMS; (6) la hermana menor de GMS; (7) la hermana mayor de GMS; (8) el Agte. José Reyes Agosto; (9) la exesposa del Apelante; (10) la Agte. Lourdes Pagán Villafañe ("Agte. Pagán Villafañe"), y; (11) la Dra. Alexa Tirado Martínez ("Dra. Tirado Martínez").

Aquilatada la prueba, el 24 de octubre de 2023, el TPI dictó sentencia de culpabilidad en contra de Casillas Walker, por tres (3) cargos de violación al Artículo 133 (a) del Código Penal, *supra*. El foro primario condenó al Apelante a una pena de quince (15) años de prisión, por cada cargo, a ser cumplidos de manera concurrentes entre sí.

Inconforme, el 13 de noviembre de 2023, Casillas Walker acudió ante esta Curia mediante *Apelación Criminal*. El Apelante señaló la comisión de los siguientes errores:

> **Erró el Honorable Tribunal de Primera Instancia al emitir un fallo de culpabilidad por los delitos de actos lascivos conforme estatuido en el Código Penal de 2012, aunque no fue derrotada la presunción de inocencia y no se establecieron los elementos del delitos [*sic*] más allá de duda razonable.**
>
> **Erró el Honorable Tribunal de Primera Instancia al emitir un fallo de culpabilidad y posterior sentencia, a pesar de que el Ministerio Público no probó los elementos del delitos [*sic*] con prueba admisible y suficiente más allá de duda razonable.**

El 17 de junio de 2024, el Apelante presentó la transcripción estipulada de la prueba oral vertida durante el juicio ("TPO"). Consecuentemente, el 28 de agosto de 2024, Casillas Walker presentó el

*Alegato Suplementario de la Parte Apelante.* Por su parte, el 10 de octubre de 2024, el Ministerio Público presentó el *Alegato de El Pueblo.* Perfeccionado el recurso y contando con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II.

### -A-

Como es sabido, la apreciación de la prueba que realiza el TPI en el ejercicio de su sana discreción está revestido de confiabilidad y merece nuestro respeto y deferencia. *Argüello v. Argüello,* 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero,* 120 DPR 92, 111 (1987). En vista de lo anterior, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales. *Pueblo v. Santiago et al.,* 176 DPR 133, 148 (2009); *Pueblo v. Acevedo Estrada,* 150 DPR 84, 99 (2000). Al respecto, nuestro más Alto Foro ha expresado lo siguiente:

> [...] no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación. *Pueblo v. Toro Martínez,* 200 DPR 834, 857 (2018), citando a *Ortiz v. Cruz Pabón,* 103 DPR 939, 947 (1995).

A esos efectos, el Tribunal Supremo de Puerto Rico ha resuelto que **un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto**. *Coop. Seguros Múltiples de P.R. v. Lugo,* 136 DPR 203, 208 (1994) (Énfasis suplido).

En consecuencia, este Tribunal Apelativo no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con la

adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (1) actuó con prejuicio o parcialidad; (2) incurrió en un craso abuso de discreción, o; (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Pueblo v. Irizarry,* 156 DPR 780, 789 (2002); *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 62-63 (1991). De igual forma, se podrá intervenir con la determinación del TPI cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble. *Pueblo v. Martínez Landrón,* 202 DPR 409, 424 (2019) citando a *Pueblo v. Maisonave Rodríguez, supra,* pág. 63. De manera que, este Tribunal solo podrá intervenir con la apreciación del foro juzgador si, luego de evaluar minuciosamente la prueba del caso, guardamos serias, razonables y fundadas dudas acerca de la culpabilidad del acusado. *Pueblo v. Casillas, Torres,* 190 DPR 398, 415-417 (2014).

**-B-**

La Constitución de Puerto Rico garantiza a toda persona acusada de delito el derecho fundamental a la presunción de inocencia. CONST. PR, Art. II, Sec. 11. Además, la Regla 304 de Evidencia, 32 LPRA Ap. VI, R. 304 (1), ha incorporado este imperativo constitucional. Asimismo, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, reitera el precitado derecho fundamental: *"[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. [...]".* A su vez, dicha norma constituye uno de los imperativos del debido proceso de ley al exigir que una persona acusada en un proceso criminal se presuma inocente, mientras no se demuestre lo contrario. *Pueblo v. Irizarry, supra,* pág. 786. *Pueblo v. León Martínez,* 132 DPR 746, 764 (1993). Para rebatir tal presunción, nuestro ordenamiento requiere que el Estado establezca la culpabilidad una persona imputada de delito más allá de duda razonable. *Pueblo v. Arlequín Vélez,* 204 DPR 117, 146 (2020). *Pueblo v. Toro Martínez, supra,* págs. 855-85; *Pueblo v. Cabán Torres,* 117 DPR 645, 652 (1986).

En otras palabras, se exige un *quantum* probatorio de más allá de duda razonable para controvertir la presunción de inocencia. *Pueblo v. Santiago*, *supra*, pág. 142.

El concepto de "duda razonable" implica necesariamente aquella que produce insatisfacción o intranquilidad en la conciencia del juzgador respecto a la evidencia presentada en el caso. *Pueblo v. Irizarry, supra*, pág. 788. Sobre este requisito, el Tribunal Supremo ha reiterado que:

> El Ministerio Fiscal no cumple con ese requisito presentando prueba que meramente sea "suficiente", esto es, que "verse" sobre todos los elementos del delito imputado; se le requiere que la misma sea "suficiente en derecho". Ello significa que la evidencia presentada, "además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación" o en un ánimo no prevenido [...] Esa "insatisfacción" con la prueba es lo que se conoce como "duda razonable y fundada". *Pueblo v. De Jesús Mercado, supra*, pág. 476, citando a *Pueblo v. Cabán Torres, supra.*

Por lo tanto, el *quantum de más allá de duda razonable* aplica para "*cada uno de los elementos del delito, la conexión de estos con el acusado y la intención o negligencia de éste*". *Íd., Pueblo v. Santiago, supra.* A su vez, se ha resuelto que:

> La determinación de que cierta prueba es suficiente para demostrar la culpabilidad del acusado más allá de duda razonable es una cuestión de raciocinio, producto de un análisis de todos los elementos de juicio del caso y no una mera duda especulativa o imaginaria. *Pueblo v. De Jesús Mercado, supra,* págs. 475-476.

**III.**

En síntesis, el Apelante sostiene que el TPI erró al sentenciarlo por los delitos de actos lascivos, a pesar de que su culpabilidad no se probó más allá de duda razonable y que los elementos del delito no fueron establecidos. De manera particular, alega que, el Ministerio Público no presentó prueba que lograra corroborar las alegaciones de la menor.

Por su parte, el Ministerio Público arguye que, el testimonio de la menor fue suficiente para probar los elementos de los delitos imputados. Asimismo, señala que, presentó prueba documental y testifical que corroboró y confirmó los actos delictivos cometidos por Casillas Walker.

Por entender que están intrínsicamente relacionados, discutiremos los errores señalados de manera conjunta, por estar dirigidos a establecer que la culpabilidad de Casillas Walker no fue probada más allá de duda razonable.

Advertimos que, en el caso de epígrafe, fue el foro de instancia quien estuvo en mejor posición para evaluar la credibilidad de los testigos de cargo y la prueba desfilada durante el juicio. Aquilatada la prueba oral y tomando en consideración que el TPI escudriñó directamente los testimonios presentados durante el juicio, consideramos impropio intervenir con su apreciación de los hechos. Dentro del marco jurídico antes enunciado, la determinación de culpabilidad que hace el juzgador de los hechos es merecedora de una gran deferencia por parte del tribunal apelativo, salvo que se demuestre pasión, prejuicio, parcialidad o error manifiesto. Esto, ya que, el foro primario fue quien tuvo la oportunidad de recibir y apreciar la prueba testifical presentada.

Sin embargo, para un cabal entendimiento, incluimos un resumen de la prueba oral más relevante que se desfiló durante el juicio y que este Panel cuidadosamente examinó.

El primer testimonio presentado por el Ministerio Público fue el del **Agte. Ismael Aguilar Carmona**. En el **directo**, autenticó las cincuenta y tres (53) fotografías que le tomó a la residencia ubicada en Canóvanas, donde, presuntamente, ocurrieron los hechos.[2] En el **contrainterrogatorio**, declaró que no le tomó fotos a la residencia ubicada en Río Grande.[3] A su vez, afirmó que desconocía si ocurrieron hechos en dicho municipio.[4] Expresó, además, que no ocupó evidencia física.[5]

Luego, declaró **GMS**, quien, al momento del juicio, tenía trece (13) años.[6] Durante el **directo**, declaró que, residía en Canóvanas y que, antes

---

[2] Véase, TPO del 7 de febrero de 2023, págs. 34-44.
[3] Véase, TPO del 7 de febrero de 2023, pág. 47.
[4] *Íd.*
[5] Véase, TPO del 7 de febrero de 2023, pág 48.
[6] Véase, TPO del 7 de febrero de 2023, pág. 57.

de residir ahí, vivía en Río Grande.[7] Relató que, para el 2019 conocía a Casillas Walker, quien era su padrastro y la pareja de su madre.[8] Señaló que, mientras vivía en Río Grande, Casillas Walker se quedaba a dormir por una semana en la casa y luego se iba unos días.[9] Afirmó que, para ese entonces, tenía nueve (9) años.[10]

Asimismo, narró que, en una ocasión, mientras se encontraba en la residencia de Río Grande, el Apelante la llamó para que lo acompañara en la habitación, mientras él veía videos en su teléfono celular.[11] Detalló que, se quedó dormida y despertó al sentir que Casillas Walker, a quien vio porque se encontraba a su lado, la estaba tocando por debajo del pantalón y de su ropa interior.[12] Puntualizó que, se quedó mirándolo "*bien seria*" y que el Apelante sacó la mano, al percatarse de que la menor se había despertado.[13]

Describió que, en otra ocasión, Casillas Walker la llamó al cuarto de su madre y le enseño un video de una mujer poniendo su boca en las partes genitales de un hombre.[14] Señaló que, el Apelante le dijo que quería hacerle eso a ella y que ella se lo hiciera a él.[15] La menor testificó que, como acto seguido, Casillas Walker puso la mano de la menor sobre su pene erecto.[16] Relató que, retiró la mano y se le quedó mirando seriamente al Apelante, pero que este, con más fuerza, volvió a colocar la mano sobre su pene.[17]

Además, expresó que el Apelante la tocaba por debajo de su ropa interior y que le apretaba sus senos.[18] Especificó que, cuando ocurrían

---

[7] Véase, TPO del 7 de febrero de 2023, pág. 60.
[8] Véase, TPO del 7 de febrero de 2023, pág. 61.
[9] Véase, TPO del 7 de febrero de 2023, pág. 65.
[10] *Íd.*
[11] Véase, TPO del 7 de febrero de 2023, pág. 66.
[12] *Íd.*
[13] Véase, TPO del 7 de febrero de 2023, pág. 67.
[14] Véase, TPO del 7 de febrero de 2023, pág. 73.
[15] *Íd.*
[16] *Íd.*
[17] Véase, TPO del 7 de febrero de 2023, pág. 74.
[18] Véase, TPO del 7 de febrero de 2023, pág. 77.

estos incidentes, ella y Casillas Walker se encontraban solos en el cuarto, mientras sus hermanas estaban en sus habitaciones o viendo televisión.[19] La menor manifestó que, el cuarto de su madre tenía un espejo que el Apelante colocó en la esquina de la habitación para ver si alguien pasaba por el pasillo de la residencia.[20]

Testificó que, a los diez (10) años, mientras se encontraba en casa de su tía, le contó a esta que ella se "*estaba dejando tocar de alguien y tenía que decirlo*".[21] La menor expresó que sintió alivio al contar eso que había estado guardando por tanto tiempo.[22]

A su vez, detalló que, durante la investigación, fue entrevistada por la agente investigadora, Agte. Pagán Villafañe, pero no recordó lo que conversó con ella.[23] También declaró que, acudió dos (2) veces a Centro Médico para conversar con la Dra. Tirado Martínez. Relató que, recibió tratamiento psicológico de la Dra. Dávila, para superar lo que estaba pasando, ya que se sentía dañada porque habían tocado su cuerpo y no se suponía que a las niñas de su edad les pasaran esas cosas.[24] Puntualizó, además, que, recibió tratamiento médico para la clamidia.[25]

Posteriormente, el Ministerio Público presentó el testimonio de la **abuela** paterna de GMS.[26] En el **directo**, la abuela testificó que, había recibido una llamada de su hija, la tía de GMS, quien le indicó que Casillas Walker había violado a la menor.[27] Relató que, al escuchar esto, fue a casa de su otra hija, donde se encontró con GMS, a quien al abrazarla, ambas comenzaron a llorar.[28] Narró que, GMS le contó que, no había contado lo sucedido porque veía feliz a su mamá y no quería que sufriera.[29] Además, expresó que, al conversar con la madre de la menor, esta le indicó que el

---

[19] Véase, TPO del 7 de febrero de 2023, pág. 78.
[20] Véase, TPO del 7 de febrero de 2023, pág. 112.
[21] Véase, TPO del 7 de febrero de 2023, pág. 201.
[22] Véase, TPO del 7 de febrero de 2023, pág. 203.
[23] Véase, TPO del 7 de febrero de 2023, pág. 210.
[24] Véase, TPO del 7 de febrero de 2023, pág. 211.
[25] Véase, TPO del 7 de febrero de 2023, pág. 223.
[26] Véase, TPO del 10 de febrero de 2023, pág. 95.
[27] Véase, TPO del 10 de febrero de 2023, pág. 101.
[28] Véase, TPO del 10 de febrero de 2023, pág. 103.
[29] Véase, TPO del 10 de febrero de 2023, pág. 104.

Apelante le había aceptado los hechos y le contó que GMS lo provocaba.[30] Manifestó, a su vez, que GMS le indicó que, Casillas Walker quería hacer un video sexual con ella, pero que únicamente fuera para él.[31]

En el **contrainterrogatorio**, puntualizó que, cuando GMS le narró la ocurrido con el Apelante, no le realizó preguntas, sino que llamó a la madre para informarle.[32]

En el **redirecto**, indicó que, no tomó acción ni llamó a la Policía porque la madre de la menor le comentó que ella iba a resolver la situación.[33] Durante el **recontrainterrogatorio**, afirmó que, la mamá de GMS le expresó que, iba a "*hacer cosas*" y que entendió que, se refería a "*cosas*" relacionadas al caso.[34]

Por otra parte, el Ministerio Público presentó como testigo a la **tía** paterna de GMS.[35] En el **directo**, afirmó que, para el 30 de octubre de 2020, GMS y su hermana menor se quedaron a dormir en su residencia por unos días.[36] Testificó que, el 8 de noviembre de 2020, les advirtió a las menores que tuvieran cuidado y no se dejaran tocar por nadie, ya que se había enterado de que una menor de quince (15) años había quedado embarazada.[37] Narró que, al rato, GMS le confesó que estuvo con el Apelante.[38] Indicó que, para ese entonces, la menor tenía diez (10) años.[39]

Durante el **contrainterrogatorio**, expresó que, aun cuando no comparte mucho con la menor, GMS le confesó que Casillas Walker la había violado.[40] Declaró, además, que GMS le indicó que el Apelante había tenido relaciones sexuales con ella, sin protección.[41] Asimismo, expresó que no indagó sobre las particularidades de lo ocurrido porque se

---

[30] Véase, TPO del 10 de febrero de 2023, pág. 116.
[31] Véase, TPO del 10 de febrero de 2023, pág. 124.
[32] Véase, TPO del 10 de febrero de 2023, pág. 149.
[33] Véase, TPO del 10 de febrero de 2023, pág. 153.
[34] Véase, TPO del 10 de febrero de 2023, pág. 167.
[35] Véase, TPO del 10 de febrero de 2023, pág. 174.
[36] Véase, TPO del 10 de febrero de 2023, pág. 176.
[37] Véase, TPO del 10 de febrero de 2023, pág. 177.
[38] *Íd.*
[39] Véase, TPO del 10 de febrero de 2023, pág. 178.
[40] Véase, TPO del 10 de febrero de 2023, pág. 188.
[41] *Íd.*

conmocionó.[42] En el **redirecto**, manifestó que, no cuestionó a la menor porque quería que se mantuviera tranquila, toda vez que estaba llorando y lucía distraída.[43]

A su vez, el Ministerio Público presentó el testimonio de la **Madre** de GMS.[44] En el **directo**, afirmó ser la expareja de Casillas Walker, con quien convivió durante su relación.[45] Indicó que, comenzó su relación con el Apelante entre el 2019 o 2020 y que, para ese entonces, residía con sus tres (3) hijas en Río Grande.[46] En corte abierta, identificó a Casillas Walker, lo cual se hizo constar en récord.[47] Desde su punto de vista, describió la relación de la menor con el Apelante como una "*muy buena*" e indicó que "*[e]ran muy cercanos. Ella siempre tenía mucho acercamiento con él, y siempre buscaba la manera de estar con él.*".[48] Especificó que, en ese momento, no veía nada malo.[49] Añadió que, para el 2019 y 2020, GMS tenía entre nueve (9) y diez (10) años.[50]

Testificó que, en mayo de 2020, se mudó a la casa de su abuela en Canóvanas, donde trabajaba haciendo uñas y comentó que atendía a su clientela desde las 6:00 a.m. o 7:00 a.m. hasta el mediodía.[51] Afirmó que, Casillas Walker se mudó con ella y sus hijas a dicha residencia.[52]

La testigo narró que, el 30 de octubre de 2020, GMS y su hermana menor se quedaron con su abuela y tía en Gurabo, pero que no recordaba en la casa de cuál de las dos.[53] Expresó que, el 8 de noviembre de 2020, mientras se encontraba en Piñones con su hija mayor y Casillas Walker, recibió una llamada de la abuela de las menores, quien le indicó que necesitaba hablar con ella.[54] Declaró que, en Gurabo, la abuela de las

---

[42] Véase, TPO del 10 de febrero de 2023, pág. 189.
[43] Véase, TPO del 10 de febrero de 2023, págs. 190-191.
[44] Véase, TPO del 13 de marzo de 2023, pág. 26.
[45] Véase, TPO del 13 de marzo de 2023, pág. 26.
[46] Véase, TPO del 13 de marzo de 2023, pág. 27.
[47] Véase, TPO del 13 de marzo de 2023, pág. 28.
[48] Véase, TPO del 13 de marzo de 2023, pág. 29.
[49] Véase, TPO del 13 de marzo de 2023, pág. 30.
[50] *Íd.*
[51] Véase, TPO del 13 de marzo de 2023, págs. 34-35.
[52] Véase, TPO del 13 de marzo de 2023, pág. 49.
[53] Véase, TPO del 13 de marzo de 2023, págs. 50-51.
[54] Véase, TPO del 13 de marzo de 2023, págs. 51-52.

menores le expresó lo siguiente: "*[q]uiero que sepas que [GMS] ya no es señorita [...] y quiero que sepas que fue Raymond*".[55] Indicó que, mientras esto ocurría, GMS se mantuvo llorando en una esquina del mueble.[56]

Describió que, al partir de Gurabo hacia la casa de los padres del Apelante, sentía enojo y ganas de llorar, que iba por el camino pidiéndole a Dios que le diera entendimiento y que no le permitiera cometer una "*locura*".[57] Al llegar a la residencia de los padres de Casillas Walker, indicó que se encontró con el hermano de este y su esposa, a quienes les dijo que el Apelante debía remover todas sus pertenencias de su casa y que iba a quemar lo que dejara allí.[58] Manifestó que, luego, acudió al lugar de trabajo del Apelante para dialogar con él, donde le comentó que GMS estaba embarazada, lo cual no era cierto, para que este le dijera la verdad.[59] Aseveró que, Casillas Walker se quedó callado y le preguntó cuánto tiempo de embarazo tenía GMS, para saber si era suyo.[60]

La testigo declaró que, posteriormente, se dirigió a la residencia de la exesposa del Apelante y madre de sus hijos, para contarle lo sucedido.[61] Allí, expresó que, la exesposa le admitió que Casillas Walker la había llamado y había aceptado lo ocurrido con GMS.[62] Relató que, al llegar al cuartel de Canóvanas, le contó al Agte. Reyes Agosto lo sucedido, quien le instruyó que llevara a GMS al hospital de su preferencia para que la examinaran.[63] Atestó que, posteriormente, la menor arrojó positivo a clamidia, por lo que hubo que suministrarle medicamentos por catorce (14) días, hasta que los laboratorios arrojaran negativo.[64]

La siguiente testigo en declarar fue la **hermana menor** de GMS, quien, al momento del juicio tenía doce (12) años.[65] En el **directo**, testificó

---

[55] Véase, TPO del 13 de marzo de 2023, pág. 55.
[56] *Íd.*
[57] Véase, TPO del 13 de marzo de 2023, pág. 57.
[58] Véase, TPO del 13 de marzo de 2023, págs. 58-59.
[59] Véase, TPO del 13 de marzo de 2023, págs. 62-63.
[60] Véase, TPO del 13 de marzo de 2023, pág. 63.
[61] Véase, TPO del 13 de marzo de 2023, págs. 66-67.
[62] Véase, TPO del 13 de marzo de 2023, pág. 68.
[63] Véase, TPO del 13 de marzo de 2023, págs. 72-73.
[64] Véase, TPO del 13 de marzo de 2023, pág. 78.
[65] Véase, TPO del 14 de marzo de 2023, pág. 12.

que, vive con su madre y hermanas en Canóvanas.[66] Relató que, una noche del 2020, vio que Casillas Walker entró a la habitación de GMS y se encerró allí.[67] Especificó que, este incidente ocurrió como a las 12:00 a.m. y que su mamá estaba durmiendo.[68] Añadió que, supo que la puerta tenía seguro porque le dio la vuelta a la cerradura y la puerta no abrió.[69] Expresó que, le comentó lo observado a su hermana mayor, pero que esta le instruyó acostarse a dormir.[70] Narró que, al día siguiente, le preguntó al Apelante por qué la puerta tenía seguro y este le contestó que estaban hablando.[71] La menor comentó que, GMS le dijo, en una ocasión, que Casillas Walker le tocaba sin permiso sus partes privadas.[72] Aseveró que, en aquel momento, no le contó a su madre que la puerta del cuarto estaba cerrada porque estaba durmiendo.[73]

Luego, testificó la **hermana mayor** de GMS, quien al momento de testificar tenía dieciocho (18) años.[74] Durante el **directo**, indicó que, en una ocasión, mientras vivían en Canóvanas, estaba durmiendo, se levantó alrededor de la 1:00 a.m. o 2:00 a.m. y vio al Apelante salir del cuarto de GMS y que, como consecuencia, se paró en el medio de la sala y se quedó mirándolo.[75] Al respecto, expresó que, la pareció extraño que Casillas Walker hubiera estado en la habitación de la menor con la puerta cerrada.[76] Relató que, en otra ocasión, su hermana menor estaba durmiendo en el sofá de la sala y esta le indicó que, vio al Apelante entrar al cuarto de GMS, que trató de entrar, pero no pudo porque la puerta tenía seguro.[77] Expresó que, cuando su hermana le contó esto, le dijo que se fuera a dormir.[78]

---

[66] Véase, TPO del 14 de marzo de 2023, pág. 13.
[67] Véase, TPO del 14 de marzo de 2023, pág. 17.
[68] Véase, TPO del 14 de marzo de 2023, pág. 18.
[69] Véase, TPO del 14 de marzo de 2023, pág. 20.
[70] Véase, TPO del 14 de marzo de 2023, págs. 20-21.
[71] Véase, TPO del 14 de marzo de 2023, pág. 22.
[72] Véase, TPO del 14 de marzo de 2023, págs. 22-23.
[73] Véase, TPO del 14 de marzo de 2023, pág. 28.
[74] Véase, TPO del 14 de marzo de 2023, pág. 63.
[75] Véase, TPO del 14 de marzo de 2023, pág. 74.
[76] Véase, TPO del 14 de marzo de 2023, pág. 75.
[77] Véase, TPO del 14 de marzo de 2023, pág. 76.
[78] *Íd.*

En el **contrainterrogatorio**, manifestó que, no le dijo a nadie que vio al Apelante saliendo del cuarto de GMS, sino que, comentó el suceso cuando le contaron lo que había pasado.[79]

Luego, testificó el **Agte. Reyes Agosto**, agente investigador, quien, durante el **directo**, relató que, asesoró a la mamá de GMS cuando acudió a presentar la querella en contra de Casillas Walker.[80] Testificó que, luego de escuchar lo relatado por la madre, refirió el asunto a la línea de Delitos Sexuales y al Departamento de la Familia.[81] Declaró que, según el protocolo, su rol se limita a escuchar a la víctima o su representante y realizar el referido a la unidad correspondiente.[82]

La siguiente testigo en declarar fue la **exesposa** del Apelante.[83] En el **directo**, detalló que, para noviembre de 2020, recibió una llamada de Casillas Walker y este le informó que GMS les había dicho a sus abuelos paternos que él la había tocado.[84] Aseveró que, el Apelante se escuchaba preocupado, aunque este le indicó que no hizo nada.[85] Relató que, al día siguiente, recibió una llamada de la madre de GMS, quien le informó que Casillas Walker le acababa de confesar lo cometido.[86] La testigo indicó que, se sentía afectada y no podía creer lo que le decían del Apelante.[87] En el **contrainterrogatorio**, atestó que, Casillas Walker nunca le confesó haber tocado a alguna de las menores.[88]

Luego, el Ministerio Público presentó el testimonio de la **Agte. Pagán Villafañe**. En el **directo**, afirmó que, el 12 de noviembre de 2020, entrevistó a la madre de GMS, quien le narró lo sucedido.[89] Testificó que, ese mismo día, entrevistó a GMS, quien tenía diez (10) años para ese momento.[90] Comunicó que, durante la entrevista, la menor lucía triste y

---

[79] Véase, TPO del 14 de marzo de 2023, pág. 95.
[80] Véase, TPO del 14 de marzo de 2023, pág. 127-128.
[81] Véase, TPO del 14 de marzo de 2023, pág. 131.
[82] Véase, TPO del 14 de marzo de 2023, pág. 133.
[83] Véase, TPO del 15 de marzo de 2023, pág. 9.
[84] Véase, TPO del 15 de marzo de 2023, pág. 11.
[85] Véase, TPO del 15 de marzo de 2023, pág. 12.
[86] Véase, TPO del 15 de marzo de 2023, pág. 13.
[87] Véase, TPO del 15 de marzo de 2023, pág. 28.
[88] Véase, TPO del 15 de marzo de 2023, pág. 35.
[89] Véase, TPO del 21 de marzo de 2023, págs. 30-41.
[90] Véase, TPO del 21 de marzo de 2023, pág. 66.

callada, y que se mantuvo en posición fetal.[91] Especificó que, la madre de la menor no participó de la entrevista.[92] Añadió que, la menor le relató que, mientras residían en Río Grande, el Apelante comenzó a tocarla por encima de la ropa y que, este le enseñó un video sexual que mostraba a un hombre y una mujer practicándose sexo oral mutuamente.[93] A su vez, declaró que, GMS le indicó que Casillas Walker le dijo que, "*tenía ganas de metérselo*".[94]

Por último, testificó la perito en psicología clínica, la **Dra. Tirado Martínez**. En el **directo**, atestó que entrevistó a GMS en cinco (5) ocasiones.[95] La Dra. Tirado Martínez señaló que, se notaba que el abuso se fue dando de manera progresiva.[96] Comentó que, inicialmente, GMS narró el incidente que ocurrió cuando vivían en Río Grande, donde Casillas Walker la llamó para que se acostara a su lado y comenzó a tocarla con las manos, de forma circular, por encima de la ropa, y luego, por debajo.[97] Asimismo, relató que, la menor le había indicado que, en ese mismo evento, el Apelante le enseñó un video de unas personas adultas practicándose sexo oral.[98]

La Dra. Tirado Martínez explicó, además, que los menores de la edad de GMS, diez (10) años, se encuentran en la etapa de desarrollo conocida como la de "*operaciones concretas*" y, por tanto, pueden identificar a su agresor, pero podrían presentar dificultad narrando los eventos en orden cronológico.[99] A su vez, ilustró que, el comportamiento de apego del menor con su agresor se puede explicar mediante el concepto del "*grooming*", lo cual definió como "*el comportamiento empleado por el agresor para poder obtener la confianza del menor*".[100] Abundó que, el "*grooming*" hacía sentir

---

[91] Véase, TPO del 21 de marzo de 2023, pág. 67.
[92] Véase, TPO del 21 de marzo de 2023, pág. 70.
[93] Véase, TPO del 21 de marzo de 2023, pág. 78.
[94] Véase, TPO del 21 de marzo de 2023, pág. 80.
[95] Véase, TPO del 23 de junio de 2023, pág. 35.
[96] Véase, TPO del 23 de junio de 2023, pág. 39.
[97] *Íd.*
[98] Véase, TPO del 23 de junio de 2023, págs. 39-40.
[99] Véase, TPO del 23 de junio de 2023, págs. 40-41.
[100] Véase, TPO del 23 de junio de 2023, pág. 49.

a la menor en una posición de privilegio con el Apelante y así, este se aseguraba de que GMS mantendría en secreto el abuso sexual.[101]

El TPI, quien estuvo en mejor posición que este foro apelativo intermedio, le confirió entera credibilidad a la prueba testifical y documental presentada durante el juicio. Reseñamos, además, que el Art. 133 del Código Penal, *supra*, tipifica el delito de "actos lascivos" de la siguiente manera:

> Toda persona que, a propósito, con conocimiento o temerariamente, sin intentar consumar el delito de agresión sexual descrito en el Artículo 130, someta a otra persona a un acto que tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del imputado [...].

Del testimonio presentado, el foro de instancia determinó que no existía duda razonable respecto a la culpabilidad del Apelante. Asimismo, concluyó que, se establecieron los elementos del delito de actos lascivos. Por todo lo cual, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, no intervendremos con su apreciación de la prueba.

**IV.**

Por los fundamentos que anteceden, se *Confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[101] Véase, TPO del 23 de junio de 2023, pág. 51.